Filed 7/8/16; second of two modifications; unmodified opinion and first modification attached

# CERTIFIED FOR PARTIAL PUBLICATION[1]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSÉ DE JESÚS OCEGUEDA,<br><br>    Defendant and Appellant. | H041157<br>(Santa Cruz County<br>Super. Ct. No. F22019)<br><br>**ORDER MODIFYING OPINION**<br><br><br>**NO CHANGE IN THE JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on June 9, 2016, be modified as follows.
On page 1, the following sentence in the first paragraph:

The jury also found firearm enhancements true as to each offense.

shall be modified as follows:

The jury also found a firearm enhancement true as to the attempted murder count.

There is no change in the judgment.

---

**[1] Under California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B., II.C., and II.D.**

Dated:_____          _____
                                         Márquez, J.


                                         _____
                                         Rushing, P.J.


People v. Ocegueda
H041157

2

Filed 6/22/16 Unmodified opinion attached

**CERTIFIED FOR PARTIAL PUBLICATION**[2]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSÉ DE JESÚS OCEGUEDA,<br><br>    Defendant and Appellant. | H041157<br>(Santa Cruz County<br>Super. Ct. No. F22019)<br><br><br>**ORDER MODIFYING OPINION**<br><br><br>**NO CHANGE IN THE JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on June 9, 2016, be modified as follows.

On page 15, in Section II.A.4. of the published part of the opinion, the following citation:

(*People v. Elmore* (2014) 59 Cal.4th 121, 133 (*Elmore*).)  (*Flannel*, *supra*, 25 Cal.3d at p. 672 [one who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter].)

shall be modified as follows:

(*People v. Elmore* (2014) 59 Cal.4th 121, 133 (*Elmore*); see *Flannel*, *supra*, 25 Cal.3d at p. 672 [one who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter].)

---

**[2] Under California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B., II.C., and II.D.**

There is no change in the judgment.

Dated:_____                    _____
                                                 Márquez, J.



                                                 _____
                                                 Rushing, P.J.



                                                 _____
                                                 Premo, J.

Filed 6/9/16 Unmodified opinion

**CERTIFIED FOR PARTIAL PUBLICATION[1]**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H041157 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. F22019) |
| v. | |
| JOSÉ DE JESÚS OCEGUEDA, | |
| Defendant and Appellant. | |

Defendant José De Jesús Ocegueda shot Martin Garcia multiple times in the chest and abdomen at a New Year's Eve party. A jury found defendant guilty of attempted murder, assault with a firearm, and dissuading a witness. The jury also found firearm enhancements true as to each offense. But the jury found not true all alleged gang enhancements as well as the allegation that the attempted murder was willful, deliberate, and premeditated. The trial court imposed an aggregate term of 37 years to life in prison.

Defendant raises four claims on appeal. First, he contends the trial court erred by failing to instruct the jury it could consider evidence of his mental disabilities with respect to his claim of imperfect self-defense. Second, he contends the trial court erred by allowing the prosecution to present a firearms expert as a rebuttal witness. Third, he contends his trial counsel was ineffective by failing to move for exclusion of his pretrial statement to police on the ground that the police failed to properly advise him of his rights under *Miranda*.[2] Fourth, he contends the trial court erred by imposing a full

---

[1] Under California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B., II.C., and II.D.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

consecutive term for the assault conviction rather than one-third the middle term as required by Penal Code section 1170.1.  The Attorney General concedes the merits of this fourth and final claim.

We hold the trial court erred by precluding the jury from considering evidence of defendant's mental disabilities in deciding whether he harbored the state of mind required for imperfect self-defense.  However, we conclude the error was harmless.  We also accept the Attorney General's concession as to the claim of sentencing error.  Accordingly, we will reverse and remand for resentencing.  As to the remaining claims, we conclude they are without merit.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

A. *Facts of the Offense*

1. *Overview*

Defendant did not deny shooting Martin Garcia on at a New Year's Eve party in 2011.  Defendant gave a statement to police in which he admitted shooting Garcia, but he claimed he did so out of fear because he believed Garcia was pulling a gun on him.  At trial, the prosecution offered evidence that defendant was a member of the Vagos, a subset of the Sureño criminal street gang in Salinas.  The prosecution's gang expert opined that defendant shot Garcia for the benefit of the gang.  Defendant put forth the theory that Garcia and other persons at the party were Norteño gang members, such that defendant feared for his safety just before the shooting.

2. *Testimony of Dulce Meraz*

Dulce Meraz testified as follows.  On December 31, 2011, her family was hosting a New Year's Eve party at their house in Watsonville.  About 15 to 25 people attended, including older relatives and young children.  The party was intended to be a family gathering and, to Meraz's knowledge, nobody at the party was associated with gangs.  The invitees included Jesse Renteria and his girlfriend Niniana Rivera.  Martin Garcia came with Renteria and Rivera.  Meraz had never seen Garcia before.

2

Around 11:00 p.m., defendant arrived with his girlfriend, Margarita "Maggie" Ruiz. Meraz had never seen them before, and she had not invited them. Defendant was wearing "a baby blue checkered shirt" and jeans. Based on the look on defendant's face and the way he was walking, Meraz got the impression he was "trouble." Defendant had a "hardcore face" and acted "really serious."

As midnight approached, several partygoers were gathered outside drinking and smoking. Those outside included Meraz's husband, Renteria, Rivera, Garcia, Ruiz, and defendant. Meraz went outside to ask them to come into the house for a countdown to midnight, but they wanted to finish smoking outside. A few minutes before midnight, Meraz was standing by the garage about five or six feet away from Garcia. The partygoers were standing around, taking pictures with their phones, and chitchatting about sports. Meraz did not see Garcia "having problems" with anyone. Garcia was not acting aggressively, "mad dogging" anyone, acting drunk, or doing anything to cause concern. Garcia was laughing and he was in a good mood.

At that point, Meraz saw defendant approach Garcia. Defendant said to Garcia, "[H]ey, let's smoke a cigarette." Garcia agreed and turned towards defendant, whereupon defendant shot Garcia. Meraz heard the gun go off three times, and she saw a muzzle flash from the gun, but she could not see the gun in defendant's hand. She did not see Garcia reach for anything or try to grab anything, nor did he take anything out from his waistband or the front of his coat. Meraz testified that Garcia did not make any aggressive moves toward defendant or call him "a little bitch."

As soon as the shots were fired, defendant ran away without saying anything to Garcia. Garcia grabbed himself with both hands and fell to the ground. Ruiz ran to her car and drove after defendant. Meraz called 911 on the cell phone in her pocket.

3. *Testimony of Jesse Renteria*

Renteria and his girlfriend, Niniana Rivera, arrived at the party with Garcia around 10:00 p.m. They had stopped at a liquor store to buy beer on the way to the party. When

3

they arrived, Rivera introduced Renteria to defendant and Ruiz. Defendant was wearing a blue and white shirt with small squares. Around 11:45 or 11:50 p.m., defendant asked Renteria if it was okay to fire a gun into the air to celebrate New Year's Eve. Renteria told defendant it was a family gathering and the hosts would not like it. Defendant did not show a gun to Renteria.

Shortly before midnight, Renteria and Rivera were standing next to Garcia outside. Defendant and Ruiz were also outside. Defendant was on his cell phone, but Renteria could not hear him talking. At some point, defendant moved closer to Garcia, who was standing a couple feet away from Renteria. Renteria then heard three or four gunshots. Garcia said, "I've been shot," and fell to the ground. Renteria felt something hit his leg when the gunshots went off. He did not see defendant pull a gun out, but he saw a muzzle flash out of the corner of his eye. He did not hear defendant or Garcia say anything to each other. He did not see Garcia reach for anything or move his arms just before the shots were fired. After Garcia was shot, defendant ran away down the street. Ruiz ran to her car, which was parked in the street in front of the house. Ruiz drove down the street, picked up defendant, and they both drove away.

Renteria testified that he never saw Garcia "mad dogging" defendant or say anything to defendant. He also testified that Garcia was not causing problems with anyone at the party or "getting up on anybody's girl."

The next day, Renteria received a strange phone call around 10:00 or 11:00 a.m. The call came from a nonlocal area code, and Renteria did not recognize the voice. The caller wanted to talk to Rivera, so Renteria handed the phone to her. He saw her expression turn to fear, and she cried after the call was over.

Several months later, Renteria had a "run in" with some Norteños at the Applebee's in Watsonville. They asked Renteria what had happened when Garcia was shot, and whether Renteria had done anything to help Garcia. Renteria told them he had not done anything because everything happened so fast. On cross-examination, Renteria

4

testified that Garcia was not a Norteño. Renteria knew some Norteños, but he did not "hang out" with them.

### 4. *Testimony of Niniana Rivera*

Niniana Rivera testified as follows. Garcia was a friend of Jesse Renteria, her boyfriend at the time of the shooting. Rivera knew Ruiz from school. Ruiz only dated Sureños, and she hung out with other girls who dated Sureños. Rivera invited Ruiz to the New Year's Eve party. Ruiz asked Rivera if it was going to be a gang party. Rivera told Ruiz it was a family party, not a gang party.

Rivera, Renteria, and Garcia drove together to the New Year's Eve party the night of the shooting. They stopped at a liquor store on the way because Garcia wanted to get beer for the party. Garcia had already had a couple of beers before they picked him up.

Ruiz and defendant arrived around 11:30 p.m. Defendant was wearing a light blue checkered shirt, but Rivera did not think he was a Sureño. Rivera did not see any Norteños at the party, but she was aware that Garcia hung out with Norteños. She was also aware that Garcia had uncles who were Norteños.

Around 11:50 p.m., Rivera went outside with defendant and Ruiz. Defendant asked Rivera if it would be okay to fire a gun at midnight. Rivera told defendant she did not know and that he should ask the hosts, but he did not do so. Instead, he went to Ruiz's car, got something out of the glove compartment, and put the object in his pocket. Rivera could not see what the object was. Defendant then rejoined Rivera and Ruiz, who were standing on the grass in front of the house.

Renteria was also outside, smoking marijuana with Garcia and others in front of the garage. Defendant wanted to smoke as well, so Rivera told him to go smoke with Renteria and the others. Defendant then walked away from Rivera and Ruiz and joined Renteria and Garcia. At that point, Rivera heard "two big loud noises." At first she thought someone had set off fireworks, but then she saw Garcia on the ground. She then saw defendant running away down the street. Ruiz was driving after him. Rivera then

5

saw a group of persons looking like Norteño gangsters who "showed up out of nowhere" to chase after Ruiz's car. When Ruiz caught up with defendant, he got into the passenger's seat. Ruiz then drove off through a red light. The police arrived a couple of minutes later and took Rivera and Renteria to the police station for questioning.

Rivera never saw any problems between defendant and Garcia. She did not see Garcia give defendant "hard looks" or say anything to him. Garcia had not been having issues with anyone else at the party either. Rivera had never seen Garcia with a gun or any other kind of weapon.

At around 11:00 a.m. the next morning, Rivera was getting up with Renteria when Renteria's phone rang. Renteria thought it was a police officer because of the strange area code. Renteria answered the phone and then handed it to Rivera. The caller told Rivera, "You better not say anything, you rat." Rivera could hear Ruiz's voice in the background, and she believed defendant was the caller. Rivera told him she would "never rat [Ruiz] out," and the caller told Rivera not to mention Ruiz's name. Rivera lied and told the caller she had not said anything to the police. The caller asked, "Did he die?" Rivera told him she did not know, and the caller hung up. Rivera, who was scared, started crying.

5. *Gang Evidence*

The prosecution's gang expert opined that defendant was a member of the Vagos subset of the Sureño criminal street gang based on the following evidence. First, defendant used a gang moniker—"Chuco," a shortened version of "Pachuco"—which meant "original gangster." Second, defendant had multiple tattoos normally worn by Sureño gang members. Third, defendant also had prior contacts with police involving altercations between gang members. Fourth, gang graffiti found on the walls of Ruiz's residence contained references to "Chuco" and the Vagos gang. Fifth, photos found on defendant's cell phone showed him flashing a V-shaped hand sign, referencing the Vagos. And sixth, the contacts listed in defendant's phone included three known Vagos

6

gang members. The police found messages on the phone in which defendant referred to himself as "Chuco" in texting with the other gang members. The gang expert also opined that Garcia was a Norteño associate, and that defendant's shooting of Garcia benefitted the Vagos gang by eliminating a rival and enhancing the gang's reputation for violence.

### 6. *Defendant's Statements to Police*

On January 8, 2012, border agents detained defendant as he tried to reenter the United States from México. Police interviewed defendant in a holding room at an Imperial County jail. At trial, the prosecution played an audio recording of the interview for the jury and provided it with a transcript of the interview.

When the police initially confronted defendant about the offense, he denied being at the party. But after continued questioning, he admitted he was at the party and he admitted shooting Garcia. Defendant claimed Garcia was "mad dogging" him and "calling me shit, calling me stuff." Defendant said Garcia called him "a little bitch" and told him to "get over here." Defendant claimed Garcia appeared to be pulling a weapon out of his waistband, so "for my protection" and "for my sake," defendant pulled a .38-caliber revolver out of his pocket and shot Garcia twice. Defendant said, "He was just approaching, he was gonna try to grab something, and so I got scared, you know?" Defendant later claimed Garcia was reaching into his coat and added, "Well, I seen something metal, obviously it's a strap." Defendant denied having any association with Sureños, and he stated that he did not know if Garcia was a Norteño.

When defendant was moved to a Santa Cruz County jail, he stated that he no longer wanted to be a Sureño and asked not to be housed with Sureños. Police re-interviewed defendant on January 18, 2012. The prosecution played an audio recording of the interview for the jury and provided them with a transcript. Defendant stated he had grown up with Sureños as neighbors and he started hanging out with them in high school. He claimed he was dropping out of the Sureños to get away from "the life" and his new life was "going good."

7

### 7. *Other Prosecution Evidence*

Police were called to the scene of the shooting at 11:57 p.m. They found Garcia lying unresponsive in the driveway. He was wearing a red plaid dress shirt and a black jacket. Based on Garcia's shirt, his haircut, and the fact that he was a Latino male in Watsonville, the responding officer testified that Garcia looked like "a gang type male." Garcia had a gunshot wound in his left chest above the heart, and another wound in the stomach area. After going in and out of consciousness, Garcia stopped breathing and the police performed CPR until an ambulance arrived. At the hospital, the police observed a third gunshot wound on the right side of Garcia's chest.

Police also searched Ruiz's bedroom soon after the shooting. They found gang graffiti on the walls, a Los Angeles Dodgers blanket over the window, and a rifle. The graffiti included references to "Chuco" and the Vagos street gang. Police found a letter to Ruiz from a Sureño gang member in prison. They also found a receipt for ammunition purchased from a Big 5 sporting goods store on New Year's Eve around 5:00 p.m. The parties stipulated that Ruiz had attempted to buy ammunition for a .38-caliber revolver, but the store would not sell it to her because she was a minor, whereupon Ruiz's sister purchased the ammunition.

Police arrested Ruiz on January 5, 2012. During her arrest, they found five spent shell casings from a .38-caliber revolver in her purse. They also found a traffic citation issued to a vehicle matching the description of the vehicle the partygoers saw Ruiz driving after the shooting. A database search of the license plate number on the citation showed the vehicle registered to defendant's mother.

The prosecution subpoenaed Ruiz to testify at trial and granted immunity for her testimony, but she refused to testify. The prosecution also attempted to subpoena Garcia to testify, but investigators for the district attorney's office were unable to serve him personally.

8

8. *Defense Evidence*

a. *Testimony of Dr. Shelley Peery*

Dr. Shelley Peery, a clinical psychologist, testified for the defense as an expert in neuropsychology. Among other things, Dr. Peery reviewed defendant's school records and gave him a battery of neuropsychological tests to assess his mental development. Defendant's school records showed he had difficulty processing auditory and visual information, and problems with his mental processing speed in general. Persons with such processing disorders might have problems with interpreting what they see or hear, or it might take them longer to arrive at a conclusion about what they see or hear.

Defendant's school records documented his I.Q. at 74, placing him in the fourth percentile. Based on her own testing, Dr. Peery testified defendant had an I.Q. of 65, indicating a mild intellectual developmental disability historically described as mild mental retardation. Defendant's behavioral functioning was in the third percentile; his processing speed was in the tenth percentile; his perceptual and reasoning skills were in the fourth percentile; his verbal skills were below the first percentile; and his working memory was also below the first percentile. Dr. Peery estimated that defendant's abilities to perform the activities of daily living were at a 13-year-old level.

Due to his disabilities, defendant had difficulty planning and understanding the causes and effects of his actions. He also had difficulties in problem solving and considering or weighing his options. Dr. Peery testified that being placed in a stressful situation would magnify those difficulties. The fact that defendant had grown up in a violent environment made it more reasonable that he would respond with force to somebody threatening him.

When Dr. Peery questioned defendant about the shooting, he told her Garcia had been "mad dogging" him at the party, yelling at him, and making him scared. Defendant claimed he thought he had seen a gun, causing him to panic, shoot Garcia, and run away. He described his actions as a response to being afraid for his life. Based on defendant's

9

statements, Dr. Peery opined that defendant was "acting from a place of fear" at the time of the offense.

### b. *Evidence of Garcia's Violent Character*

The defense presented several witnesses who testified about multiple acts of violence that Garcia had previously committed. In January 2007, Enrique Cabrera was in a car with Garcia's sister when Garcia and a group of friends smashed one of the car's windows and attacked the occupants. The police took Garcia into custody following the incident. In July 2007, Garcia attacked José Vaca at a McDonald's restaurant in Watsonville. Garcia and Vaca had previously fought each other in the parking lot of a bowling alley. In the incident at the McDonald's, Vaca was waiting in the parking lot of the restaurant when Garcia attempted to drive his car into Vaca. After Vaca eluded the car, Garcia got out of the car and assaulted Vaca with his fists. Garcia subsequently attempted to start a fight with one of Vaca's coworkers.

### 9. *Rebuttal Witnesses for the Prosecution*

The prosecution offered two witnesses in rebuttal—Dr. Jonathan French and firearm expert Ronald Lamb.

*Dr. Jonathan French*—Dr. Jonathan French, a psychologist in private practice, testified as an expert in forensic psychology. Dr. French opined that Dr. Peery's psychological analysis of defendant fell below forensic standards. He criticized Dr. Peery for failing to consider all the evidence and failing to cross check statements or facts upon which she relied. He testified that Dr. Peery failed to take into consideration defendant's involvement in a criminal street gang and failed to take adequate care to assure defendant was not malingering during her examinations.

*Ronald Lamb*—Ronald Lamb, a firearms trainer and consultant, testified as an expert in small arms and tactics. Lamb opined on the length of time required for a person to draw a pistol and fire in self-defense. Based on a hypothetical set of facts resembling those asserted by the defense, Lamb opined that a person in defendant's circumstances

10

could not have drawn and fired his weapon three times before the target was able to return fire.

B. *Procedural Background*

In August 2012, the prosecution charged defendant by information with: Count One—Active participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)); Count Two—Attempted premeditated murder (Pen. Code, §§ 187, subd. (a), 664, subd. (a)); Count Three—Assault with a firearm (Pen. Code, § 245, subd. (a)(2)); and Count Four—Dissuading a witness by force or threat (Pen. Code, § 136.1, subd. (c)(1)). Prior to trial, Count One was dismissed in the interests of justice. As to Count Two, the information alleged defendant personally and intentionally discharged a firearm, proximately causing great bodily injury. (Pen. Code, § 12022.53, subd. (d).) As to Count Three, the information alleged defendant carried a firearm on his person in the commission of a street gang crime. (Pen. Code, § 12021.5, subd. (a).) As to Counts Two, Three, and Four, the information alleged the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang. (Pen. Code, § 186.22, subd. (b)(1).)

The case proceeded to trial in January 2014. On March 3, 2014, the jury found defendant guilty on all counts. As to Count Two, the jury found the firearm enhancement to be true, but it found not true the allegation that the murder was willful, deliberate, and premeditated. The jury also found not true all alleged gang enhancements.

The trial court imposed an indeterminate term of 34 years to life consecutive to a determinate term of three years. The term of 34 years to life consisted of the upper term of nine years on Count Two with a consecutive term of 25 years to life for the firearm enhancement. The determinate term of three years consisted of the midterm of three years on Count Three concurrent with the midterm of three years on Count Four.

11

## II. DISCUSSION

### A. *Jury Instructions Regarding Mental Disabilities and Imperfect Self-Defense*

Defendant contends the trial court erred by failing to instruct the jury it could consider evidence of his mental disabilities in deciding whether he had the state of mind required for imperfect self-defense. The Attorney General contends defendant forfeited the claim by failing to request a pinpoint instruction. She further argues defendant was not entitled to such an instruction because unreasonable self-defense cannot be based on delusion, and defendant failed to present evidence sufficient to support a finding of unreasonable self-defense.

### 1. *Procedural Background*

Based on CALCRIM No. 604, the trial court instructed the jury on attempted voluntary manslaughter under a theory of imperfect self-defense. Based on CALCRIM No. 3428, the court also instructed the jury on the effect of mental disabilities, as follows: "You have heard evidence that the defendant may have suffered from a mental disease, defect, or disorder. You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crimes and special allegations, the defendant acted or failed to act with the specific intent or mental state required for those crimes and special allegations. [¶] Those specific intents and mental states are as follows: [¶] Number 1: The intent to kill contained in attempted murder and attempted voluntary manslaughter. [¶] Number 2: The premeditation and deliberation contained in the special allegation relating to the charge of attempted murder."[3] Defense counsel did not request any modification of this instruction to include the state of mind required for imperfect self-defense.

---

[3] The instruction continued by listing the mens rea requirements for the remaining charges and enhancements. Those portions of the instruction are not at issue here.

12

2. *Legal Principles*

"Manslaughter is the unlawful killing of a human being without malice." (Pen. Code, § 192.) "The vice is the element of malice; in its absence the level of guilt must decline." (*People v. Flannel* (1979) 25 Cal.3d 668, 680, superseded by statute on other grounds.) When a defendant intentionally kills based on an honest belief in the need for self-defense, but this belief is not objectively reasonable, the defendant acts in "imperfect" or "unreasonable" self-defense. This state of mind negates malice, reducing the offense to voluntary manslaughter. "It is the honest belief of imminent peril that negates malice in a case of complete self-defense; the reasonableness of the belief simply goes to the justification for the killing." (*Id.* at p. 679.) "*An honest but unreasonable belief that it is necessary to defend oneself from imminent peril to life or great bodily injury negates malice aforethought, the mental element necessary for murder, so that the chargeable offense is reduced to manslaughter.*" (*Id.* at p. 674, italics in original.)

Penal Code section 28 (Section 28) circumscribes the use of evidence of mental disease or defect, as follows: "Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, *or harbored malice aforethought*, when a specific intent crime is charged." (§ 28, subd. (a), italics added.)

"The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law [citations] and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration." (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

13

3. *Forfeiture*

The Attorney General contends defendant forfeited his claim by failing to request a pinpoint instruction below. Both parties agree that the trial court had no sua sponte duty to instruct the jury on mental disabilities with respect to defendant's state of mind. (*People v. Ervin* (2000) 22 Cal.4th 48, 91 [sua sponte instructions on the effect of mental disabilities became unnecessary with the abolition of the diminished capacity doctrine]; see *People v. Saille* (1991) 54 Cal.3d 1103, 1120 [after abolition of diminished capacity doctrine, instruction relating evidence of intoxication to mental state required for an offense is a pinpoint instruction that need not be given sua sponte].) However, defendant argues that once the trial court gave such an instruction, it had a duty to do so correctly. (See *People v. Pearson* (2012) 53 Cal.4th 306, 325 [although a trial court has no sua sponte duty to give a pinpoint instruction on the relevance of evidence of voluntary intoxication, when it does choose to instruct, it must do so correctly].)

We agree with defendant insofar as the claimed error affected his substantial rights. The California Supreme Court recently affirmed this principle in *People v. Townsel* (2016) 63 Cal.4th 25 (*Townsel*).) There, the defendant argued that the trial court's instruction on the effect of his mental disabilities erroneously precluded the jury from considering his disabilities in deciding whether he formed the requisite mental states for murder and other charges. The trial court had given the challenged instruction at the request of both parties. On appeal the Attorney General asserted the invited error doctrine. Our high court acknowledged the principle that it is incumbent on the defendant to affirmatively seek a proper instruction, but held the claim reviewable under Penal Code section 1259: "The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (Pen. Code, §1259.) Under this standard, "[t]he question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818." (*People v. Anderson* (2007)

14

152 Cal.App.4th 919, 927 [error affected defendant's substantial rights if it is reasonably probable a more favorable result would have been reached in the absence of the error].) Because defendant's argument here is substantially similar to the defendant's claim in *Townsel*, we will consider the merits of the argument under the *Watson* standard.[4] (See *People v. McGehee* (2016) 246 Cal.App.4th 1190.)

4. *The Trial Court Erred by Limiting the Jury's Consideration of Defendant's Mental Disabilities*

A defendant who acts with the state of mind required for imperfect self-defense does not harbor express malice. "Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense." (*People v. Elmore* (2014) 59 Cal.4th 121, 133 (*Elmore*).) (*Flannel*, *supra*, 25 Cal.3d at p. 672 [one who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter].) Taking these principles together, California law allows the jury to consider a defendant's mental disabilities in deciding whether he or she had an actual but unreasonable belief in the need for self-defense. But with respect to the attempted murder charged here, the trial court instructed the jury it could consider evidence of defendant's mental disabilities "only for the limited purpose" of deciding whether defendant harbored the "intent to kill." As noted earlier, however, Section 28 expressly makes evidence of mental disabilities admissible to consider whether a defendant harbored express malice. Therefore, by limiting the jury's consideration of mental disability evidence to the question of whether defendant had an

---

[4] Defendant further contends his trial counsel was ineffective by failing to request a pinpoint instruction. Because the *Watson* standard is substantially the same as the prejudice prong of *Strickland v. Washington* (1984) 466 U.S. 668 (defining prejudice as the reasonable probability of a result more favorable to defendant), we need not consider this claim. (See *Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050 [comparing *Watson* standard to *Strickland* standard].)

15

intent to kill—but not whether he harbored express malice—the trial court's instruction ran afoul of Section 28.

The Attorney General argues the instructions were correct because the standard instructions on attempted murder and attempted voluntary manslaughter "do not require a showing of malice per se, but instead, a showing of the specific intent to kill." This claim is mistaken. CALCRIM No. 604, the pattern instruction on attempted voluntary manslaughter under a theory of imperfect self-defense, instructs jurors: "The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense." This properly places the burden on the prosecution to prove the existence of *malice*, not simply the intent to kill. Indeed, one of the requirements of imperfect self-defense as set forth in the pattern instruction is that the "[t]he defendant intended to kill when he acted." But this does not make such a defendant guilty of attempted murder. To the contrary, a defendant acting in imperfect self-defense cannot be convicted of attempted murder because murder requires malice, and express malice requires "a deliberate intention *unlawfully* to take away the life of a fellow creature." (Pen. Code, § 188.) A defendant who intends to kill in imperfect self-defense does not do so "unlawfully" within the meaning of Penal Code section 188. (*Elmore*, *supra*, 59 Cal.4th at pp. 132-133.)

The Attorney General correctly notes that the trial court never instructed the jury on the meaning of malice. Indeed, the word "malice" appears nowhere in the trial court's instructions. But in modifying CALCRIM No. 3428, the pattern instruction on mental disabilities, the court substituted the phrase "intent to kill" in place of the phrase "malice aforethought," the latter of which appears expressly in the pattern instruction. As noted above, these two phrases are not always equivalent.

The Attorney General further contends the instructions were correct because the trial court instructed the jury, when considering whether defendant had the state of mind required for imperfect self-defense, to "consider all the circumstances as they were

16

known and appeared to the defendant." "It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538, disapproved on other grounds by *People v. Reyes* (1998) 19 Cal.4th 743.) If the charge as a whole is ambiguous, we consider whether there is a "reasonable likelihood" the jury misapplied the instruction. (*Middleton v. McNeil* (2004) 541 U.S. 433, 437.)

Here, to the extent there was any ambiguity, there is no reasonable likelihood the jury understood the given instructions to mean it could consider defendant's mental disabilities in assessing his belief in the need for self-defense. While the court instructed the jury to consider "circumstances as they were known and appeared" to the defendant, this did not allow the jury to consider whether his perceptual or sensory processing disabilities made it more likely that self-defense would appear to be necessary to him. By contrast, the erroneous instruction explicitly limited the jury's consideration of mental disabilities to the issue of whether he intended to kill. The court's instruction was therefore erroneous.

The Attorney General also contends defendant was not entitled to *any* instruction on imperfect self-defense because the evidence did not support it. She argues that imperfect self-defense can only be supported by a true mistake of fact, not mental disabilities. For this proposition she relies on *Elmore*, *supra*, 59 Cal.4th 121.

In *Elmore*, the court held that a defendant who acts based *solely* on a delusional belief in the need for self-defense is not entitled to a jury instruction on imperfect self-defense. The court distinguished a delusional belief from a true mistake of fact: "A defendant who makes a factual mistake misperceives the objective circumstances. A delusional defendant holds a belief that is divorced from the circumstances. The line between mere misperception and delusion is drawn at the absence of an objective correlate. A person who sees a stick and thinks it is a snake is mistaken, but that

17

misinterpretation is not delusional. One who sees a snake where there is nothing snakelike, however, is deluded. Unreasonable self-defense was never intended to encompass reactions to threats that exist only in the defendant's mind." (*Id.* at p. 137.) The Attorney General argues that *Elmore* precludes any instruction on imperfect self-defense here because, if defendant's asserted belief in the need for self-defense was a consequence of his mental disabilities, then such a belief was necessarily delusional.

We disagree. We do not read *Elmore* as precluding imperfect self-defense in any case where mental disabilities affect the defendant's beliefs or perceptions. The key distinction identified in *Elmore* is the "absence of an objective correlate." (*Elmore*, *supra*, 59 Cal.4th at p. 137.) Here, defendant claimed he saw Garcia pull a metal object—which defendant believed to be a gun—out of his waistband. The Attorney General suggests that such a belief, even if genuine, must have been purely delusional because no other witness saw Garcia make such a motion, and no gun or gun-like object was found on Garcia. But a single witness, even if not inherently credible, may provide sufficient evidence to establish a fact. (*People v. Zavala* (2005) 130 Cal.App.4th 758, 766, citing *People v. Chavez* (1985) 39 Cal.3d 823, 831; *People v. Davis* (1966) 241 Cal.App.2d 51, 54.) Based on defendant's statements, the jury reasonably could have inferred that Garcia actually made some threatening motion or pulled out a metallic object, such as a cell phone, from his waistband. Whether defendant's statements were sufficiently credible or his beliefs purely delusional were questions of fact for the jury to decide. *Elmore* does not establish a heightened evidentiary standard requiring corroborating evidence independent of defendant's statements to show his beliefs were not purely delusional.

For these reasons, the trial court erred by precluding the jury from considering evidence of defendant's mental disabilities in deciding whether he harbored the state of mind required for imperfect self-defense. After carefully reviewing the record, however, we conclude this error was not prejudicial.

18

5. *The Instructional Error Did Not Prejudice Defendant*

We review the possibility of prejudice under the standard set forth in *Watson, supra*. Under this standard, we conclude it is not reasonably probable the jury would have reached an outcome more favorable to defendant in the absence of the instructional error.

As the Attorney General points out, the sole evidence supporting defendant's claim of self-defense consisted of his own self-serving statements. The defense presented no evidence to corroborate defendant's version of events. To the contrary, every other witness who saw defendant's interactions with Garcia on the night of the shooting testified that Garcia did nothing to threaten defendant. No other witness saw defendant make any threatening movement before defendant shot him, and there was no evidence of any gun, weapon, or weapon-like object found on Garcia's person after the shooting.

Furthermore, defendant lied multiple times in the course of his statement to the police. He initially denied being present at the party. He further lied about Ruiz's conduct following the shooting. It is therefore not reasonably likely the jury would have credited defendant's claims of self-defense while rejecting the prosecution's evidence to the contrary. Absent defendant's self-serving claims, the defense presented no evidence to support a theory of self-defense. Thus, even if the jury had been allowed to consider evidence of defendant's mental disabilities in assessing his state of mind for imperfect self-defense, it is not reasonably probable the jury would have reached an outcome more favorable to him. We therefore conclude defendant was not prejudiced by the instructional error.

B. *Asserted* Carter *Error*

Defendant contends the trial court erred by allowing the prosecution to present the testimony of a firearms expert in rebuttal to testimony by the defendant's expert psychologist. The Attorney General argues that the firearm expert's testimony

19

constituted proper rebuttal. We conclude the trial court did not abuse its discretion by allowing the firearm expert to testify in rebuttal.

### 1. *Legal Principles*

During a trial, after the prosecution and defense have offered evidence in support of their cases, "[t]he parties may then respectively offer rebutting testimony only, unless the court, for good reason, in furtherance of justice, permit them to offer evidence upon their original case." (Pen. Code, § 1093, subd. (d).) This restriction serves three purposes: (1) to ensure the orderly presentation of evidence so the trier of fact is not confused; (2) to prevent the prosecution from unduly magnifying certain evidence by dramatically introducing it late in the trial; and (3) to avoid unfair surprise to the defendant from sudden confrontation with an additional piece of crucial evidence. (*People v. Carter* (1957) 48 Cal.2d 737, 753 (*Carter*).) "Thus proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he [or she] has introduced new evidence or made assertions that were not implicit in his [or her] denial of guilt." (*Id.* at pp. 753-754.) This restriction applies only to crucial or material evidence that properly belongs in the prosecution's case-in-chief. (*People v. Friend* (2009) 47 Cal.4th 1, 44.) "The decision to admit rebuttal evidence rests largely within the discretion of the trial court and will not be disturbed on appeal in the absence of demonstrated abuse of that discretion." (*People v. Young* (2005) 34 Cal.4th 1149, 1199.)

### 2. *Admission of Lamb's Testimony Was Not an Abuse of Discretion*

Defendant put forth the expert testimony of Dr. Peery, summarized above in Section I.A.8.a., to establish the nature and degree of defendant's mental disabilities, as well as their effect on his state of mind at the time of the shooting. On cross-examination, Dr. Peery opined about the effect of defendant's mental disabilities on his motor skills and how they would have affected his ability to draw a gun in reaction to a

threatening movement by Garcia. In response to questioning about whether defendant's disabilities would have negatively affected his ability to draw a gun quickly, Dr. Peery drew a distinction between physical motor skills and the type of perceptual disabilities suffered by defendant. The prosecution then proffered the testimony of firearms expert Ronald Lamb, summarized above in Section I.A.9., concerning the length of time required to draw and fire a gun in self-defense. The trial court sua sponte raised the issue of whether Lamb's testimony constituted proper rebuttal. In response, the prosecution identified the above testimony by Dr. Peery as providing a proper basis for the proffered rebuttal testimony.

Defendant disputed the prosecution's characterization of Dr. Peery's opinions and objected to Lamb's testimony on this and other grounds. The court overruled defendant's objections and found Lamb's testimony "appropriate for rebuttal purposes in light of the testimony offered by Dr. Peery." The trial court did not abuse its discretion in so ruling.

First, Dr. Peery's testimony included "new evidence" and "assertions that were not implicit" in defendant's initial denial of guilt. (*Carter*, *supra*, 48 Cal.2d at pp. 753-754.) Second, Lamb's testimony was not so central to the prosecution's case that it necessarily should have been included in the prosecution's case-in-chief. Third, there was no danger of confusing the jury by presenting the evidence on rebuttal. And fourth, the introduction of Lamb's testimony on rebuttal did not "unduly magnify" its importance or create "unfair surprise" by presenting a crucial piece of evidence at the last moment. (*Id.* at p. 753.) We thus conclude this claim is without merit.

C. *Trial Counsel's Failure to Seek Exclusion of Defendant's Statements to Police Based on an Incomplete Miranda Warning*

In their initial interview of defendant after the shooting, police informed defendant of his *Miranda* rights by stating, in relevant part: "Anything you say may be used in court, do you understand that?" This admonition did not warn defendant that his

21

statement could be used against him, but in all other respects the warning complied with *Miranda*.

Defendant claims the above-quoted portion of the warning was constitutionally defective because police did not warn him that his statement to police could be used *against* him in court. But trial counsel did not assert this omission as a basis for exclusion, even though she moved in limine to exclude defendant's statement on other grounds.

The trial court ultimately denied defendant's motion to exclude his statement to police. Defendant now contends trial counsel provided ineffective assistance by failing to seek exclusion of his statement on the ground that the *Miranda* warning was defective. The Attorney General argues that any deviation from the usual *Miranda* warnings was not significant enough to require reversal because the given warnings adequately advised defendant of his privilege against self-incrimination.

1. *Legal Principles*

The United States Supreme Court established the requirement for the administration of warnings regarding a person's privilege against self-incrimination in the seminal case of *Miranda*, *supra*. The court held: "The warning of the right to remain silent must be accompanied by the explanation that anything said can and will be used against the individual in court. This warning is needed in order to make him [or her] aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he [or she] is faced with a phase of the adversary system—that he [or she] is not in the presence of persons acting solely in his [or her] interest." (*Miranda*, *supra*, 384 U.S. at p. 469.) *Miranda* warnings, however, need not be given "in the exact form described in that decision." (*Duckworth v. Eagan* (1989) 492 U.S. 195, 202.) "Thus, a reviewing court need not examine a *Miranda*

22

warning for accuracy as if construing a legal document, but rather simply must determine whether the warnings reasonably would convey to a suspect his or her rights as required by *Miranda*." (*People v. Samayoa* (1997) 15 Cal.4th 795, 830.)

To demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was deficient because counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. (*Strickland v. Washington*, *supra*, 466 U.S. at pp. 687-688.) Second, he or she must show prejudice flowing from counsel's performance or lack thereof. (*Id.* at pp. 691-692.) "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.)

2. *Defendant Was Not Prejudiced by any Failure of his Trial Counsel to Seek Exclusion of his Statement to Police*

We first consider defendant's argument that the *Miranda* warning was constitutionally defective. For this proposition, defendant relies on *People v. Bradford* (2008) 169 Cal.App.4th 843, and *United States v. Tillman* (6th Cir. 1992) 963 F.2d 137. In both cases, police neglected to inform the defendant that his statement could be used against him. And in both cases, the police failed to warn the defendant that his statement could be used in court. Neither case is squarely on point because the police here warned defendant his statements "may be used in court," but without warning defendant his statements could be used *against* him. The Attorney General contends the wording of the admonishment, while incomplete, was sufficient to convey the full substance of the warning to defendant.

Arguably, a warning that one's statement "may be used in court" reasonably conveys the notion that one's statement can be used *against* him or her. This would be especially true where, as here, the interview is administered by police who have arrested

23

the interviewee and taken him or her into custody at a jailhouse. On the other hand, police commonly use the tactic of implying that making a statement to them about an incident under investigation might *benefit* the declarant in some fashion. For example, the police here repeatedly told defendant that other witnesses were blaming him, and they wanted to "give [him] a chance" to "explain [his] side of it." They further told defendant that if he failed to give his version of events, "[t]hey're gonna see you as a coldblooded dude who's gonna kill somebody," and they claimed they did not want to see defendant "flush [his] life down the toilet." Arguably, defendant might have been less susceptible to these tactics if police had first made clear that defendant's statements were going to be used *against* him—i.e., "that he [was] faced with a phase of the adversary system—that he [was] not in the presence of persons acting solely in his interest." (*Miranda*, *supra*, 384 U.S. at p. 469.)

But even assuming the warning was constitutionally defective, and assuming counsel should have sought to exclude the statement on that ground, defendant cannot show he was prejudiced by counsel's failure to do so. Defendant's admission to the shooting was not central to the prosecution's case. Abundant evidence established that defendant was the shooter. Three witnesses testified to the facts supporting his identity as the shooter, and his immediate flight from the scene with the assistance of Ruiz also pointed to that conclusion. Also, defendant made a phone call the morning after the shooting warning a witness not to talk to the police and asking whether the victim was still alive, five spent shell casings were found in Ruiz's purse, and police found a receipt showing the ammunition was purchased just hours before the party. Furthermore, as the Attorney General points out, without his statement to the police, defendant had no evidence to support his claim of self-defense. For these reasons, we conclude it is not reasonably probable the jury would have reached a more favorable verdict even if defendant's statement to police had been excluded. Absent a showing of prejudice under *Strickland*, this claim is without merit.

24

D. *Imposition of a Full Consecutive Term for the Assault Conviction*

Defendant contends the trial court erred by imposing a full consecutive three-year term on Count Three, the assault conviction. The Attorney General concedes the merit of this claim. We agree with the parties and accept the Attorney General's concession.

As set forth above in Section I.B., the trial court imposed the upper term of nine years for Count Two, the attempted murder conviction. Based on the firearm enhancement, the court also imposed a term of 25 years to life on that count. The court characterized this as "a total indeterminate term of 34 years to life." On Count Three, the court imposed the middle term of three years. The court then ordered the term of 34 years to life on Count Two to run consecutive to the three-year term on Count Three. Defendant contends the imposition of a full consecutive term on Count Three violated Penal Code section 1170.1 (Section 1170.1), which required the court to impose one-third the middle term on that count. We agree.

Section 1170.1 governs sentencing for multiple felony offenses punishable by a determinate low, middle, or upper term. (*People v. Neely* (2009) 176 Cal.App.4th 787, 797.) The trial court first selects a base term—either the low, middle or upper term—for each offense. (*Id.* at p. 798; Pen. Code, § 1170; Cal. Rules of Court, rule 4.405(2).) If a consecutive sentence is merited, the court designates the offense with the greatest selected base term as the principal term, including any additional terms for applicable enhancements. (Pen. Code, § 1170.1, subd. (a).) The court then imposes the full base term for the principal term offense followed by one-third the middle term for any consecutive term. (*Ibid.*)

It appears the trial court and the probation report categorized the term of 34 years to life on Count Two as an indeterminate sentence and, therefore, a term not subject to Section 1170.1. But that section applied to sentencing on all three counts based on the determinate term of nine years for the attempted murder conviction, notwithstanding the indeterminate term imposed for the firearm enhancement. "[A]n indeterminate

25

enhancement does not merge with the determinate offense to make the entire term encompassed by the indeterminate sentencing law." (*People v. Sanders* (2010) 189 Cal.App.4th 543, 558, citing *People v. Montes* (2003) 31 Cal.4th 350, 358-359.) "That is, the sentence imposed for the offense does not merge with the sentence on the enhancement. [Citation.] In legal contemplation, the count and the enhancement remain distinct." (*Ibid.*)

The trial court should have sentenced defendant on all counts as required by Section 1170.1, under which the punishment for any term consecutive to the base term should have consisted of one-third the applicable middle term. Accordingly, we will reverse and remand for resentencing.

### III.   DISPOSITION

The judgment is reversed and the matter is remanded for resentencing in accordance with this opinion.

26

_____
Márquez, J.

WE CONCUR:


_____
 Rushing, P.J.




_____
 Premo, J.




No. H041157
The People v. Ocegueda

Trial Court:                          Santa Cruz County
                                      Superior Court No.:  F22019

Trial Judge:                          The Honorable Timothy R. Volkmann


Attorney for Defendant and Appellant  Paul Couenhoven
José De Jesús Ocegueda:               under appointment by the Court of
                                      Appeal for Appellant




Attorneys for Plaintiff and Respondent  Kamala D. Harris,
The People:                             Attorney General

                                        Gerald A Engler,
                                        Chief Assistant Attorney General

                                        Jeffrey M. Laurence,
                                        Senior Assistant Attorney General

                                        Catherine A. Rivlin,
                                        Supervising Deputy Attorney General

                                        Gregg E. Zywicke
                                        Deputy Attorney General

H041157
The People v. Ocegueda