Filed 12/7/21 (unmodified opinion attached)
<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----


| | |
|---|---|
| THE PEOPLE, | C087191 |
| Plaintiff and Respondent, | (Super. Ct. No. F16000111) |
| v. | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| JASON CARL SCHULLER, | |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |


APPEAL from a judgment of the Superior Court of Nevada County, Candace S. Heidelberger, Judge. Affirmed.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Michael P. Farrell, Senior Assistant Attorney General, Daniel B. Bernstein, Supervising Deputy Attorney General and Peter H. Smith, Deputy Attorney General, for Plaintiff and Respondent.


1

THE COURT:

It is ordered that the published opinion filed on November 10, 2021 be modified as follows:

1.    On page 18, delete the language in section III of the Discussion, and replace with the following:

Defendant argues the error was prejudicial because there was a reasonable chance the jury would have convicted him of voluntary manslaughter had it been instructed on imperfect self-defense.  We disagree.

Our high court has held that prejudice stemming from the failure to instruct on a lesser included homicide offense is analyzed under the harmless error test in *People v. Watson*  (1956) 46 Cal.2d 818, 836.  (*People v. Gonzalez* (2018) 5 Cal.5th 186, 195-196 (*Gonzalez*) [holding that the failure to provide instructions on lesser included offenses of second degree malice murder, voluntary manslaughter, and involuntary manslaughter was harmless error, applying *Watson*]; *Breverman, supra,* 19 Cal.4th at p. 149.)  " '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.'  [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 955.)  "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration.  In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Beltran,* at p. 956.)

Defendant, however, asserts in a petition for rehearing that the harmless beyond a reasonable doubt standard from *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] (*Chapman*) applies where a trial court refuses a defendant's request for an imperfect self-defense instruction.[1]  Under the *Chapman* standard, "

---

[1] In his original briefing, defendant pointed out that our high court has held the failure to instruct on lesser included offenses is to be reviewed under *Watson* in non-capital cases, and argued he should not receive "fewer rights" just because he is not facing capital punishment.  We must disagree with this contention.  Our high court in *Gonzalez* noted: "Although we have long recognized the duty to instruct on lesser included offenses under California law, neither we nor the United States Supreme Court recognizes a similar duty to instruct on lesser included offenses under *federal constitutional law*—at least in noncapital cases." (*Gonzalez, supra*, 5 Cal.5th at p. 198.)  We are bound by our high

'an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " (*People v. Geier* (2007) 41 Cal.4th 555, 608; accord, *People v. Aledamat* (2019) 8 Cal.5th 1, 3.) "The harmless error inquiry asks: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*Geier*, at p. 608.) Put differently, "we examine the entire record and must reverse if there is a ' " 'reasonable possibility' " ' that the error contributed to the verdict." (*People v. Reese* (2017) 2 Cal.5th 660, 671.)

Defendant cites the Fourth District's recent decision, *People v. Dominguez* (2021) 66 Cal.App.5th 163 (*Dominguez*), holding *Chapman* applies to the failure to instruct on heat of passion voluntary manslaughter. The court reasoned that "because malice is an element of murder and heat-of-passion negates malice, when heat of passion is put in issue the federal due process clause requires the prosecution to prove the absence of provocation beyond a reasonable doubt." (*Id.* at pp. 183-184.)

*Dominguez*, relied on *People v. Thomas* (2013) 218 Cal.App.4th 630, 641-642, which arrived at the same conclusion. But *Thomas* predated the California Supreme Court's decision in *Gonzalez, supra*, 5 Cal.5th 186. And *Dominguez* did not mention *Gonzalez* or our high court's clear pronouncement made in the context of trial court error in failing to instruct on second degree murder, voluntary manslaughter, and involuntary manslaughter: "The failure to instruct on lesser included offenses supported by substantial evidence [is] state law error." (*Id.* at p. 196.) The *Gonzalez* court went on to reject the defendant's contention that the trial court committed structural error when it omitted instructions "on murder with malice aforethought, its lesser included offenses, and its defenses," stating: "The trial court's failure to instruct on lesser included offenses and defenses of murder with malice aforethought is subject to harmless error review." (*Id.* at p. 199.) The *Gonzalez* court did note that the omission of an element of the offense from instructions is federal Constitution error because a jury must find the defendant guilty of every element of the crime of conviction beyond a reasonable doubt. (*Id.* at pp. 198-199.) But the court did not equate the failure to instruct on imperfect self-defense or sudden quarrel/heat of passion — defenses to murder with malice aforethought — to the failure to instruct on the element of malice. Instead, it rejected the defendant's structural error contention, which was based on a similar argument and held that the failure to instruct on lesser included offenses, including

---

court's pronouncement. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 52 Cal.2d 450, 455.)

voluntary manslaughter, was state law error to which the *Watson* standard applies. (*Id*. at pp. 196, 199.)

In any event, what standard applies does not matter here.  On the record before us, the error was harmless under either standard given the overwhelming evidence that defendant was not acting in any form of self-defense.  Defendant's account of the killing radically changed leading up to trial.  Shortly after he was apprehended, he implied to law enforcement that W.T. was gay and coming on to him — defendant said nothing of killing in self-defense.  But during trial, defendant told the jury he lied to the police because he thought "the gay thing" would have been "more justifiable for what happened."

Two forensic psychologists testified that defendant appeared to be malingering.  One testified that psychological testing designed to determine whether a person is malingering or exaggerating psychiatric symptoms supported this conclusion.  The other testified that hallucination of demons is unusual for people with mental health issues.  She also noted that in a recorded jail conversation shortly after defendant's arrest, defendant talked about his case without mentioning hallucinations or demons or any of the problems he described during interviews with her.  Similarly, a detective testified that defendant seemed lucid in his earlier recorded jail phone conversations, only to later exhibit delusions about government conspiracies, angels, and demons after it "became clear" he would pursue a mental health defense.  The testimony of the psychologists and the detective undercut the credibility of the claim he acted in self-defense, as well as the credibility of his claim he was suffering from delusions or hallucinating.

Defendant's attempt to destroy the body (and perhaps the house) and his flight also undercut his claim of self-defense.  Indeed, there was an inherent contradiction in defendant's testimony that he tried to call the police after the shooting, only to be stymied by the ringing phone — yet, when police found him, rather than seek their help, he led them on a 38-mile pursuit, surrendering only after his car was rendered inoperable and an hour-long standoff had ensued.

Indeed, defendant testified he wanted to call 911 but had trouble unlocking W.T.'s phone to do so.  But when someone called (the daughter said she called numerous times after hearing noises), instead of answering the phone and asking the caller to get help, defendant shot the phone to make it stop ringing.  Shortly thereafter, he fled without summoning help from anyone nearby, leaving the house to burn down.

Other aspects of defendant's testimony undercut his credibility.  Defendant testified he set the gun on the table, even though W.T. still had a knife in his hand.  Under the circumstances as he described them, defendant's claim of unilateral

4

disarmament by setting the gun down lacked credibility. He testified on direct examination that "as soon as" he set the gun down on the table, W.T. went for it and raised the knife. Yet, on cross-examination the following day, he testified that after he put the gun on the table, he started to walk away toward the front door because "he just wanted to leave." Aside from disproving his earlier testimony indicating W.T. immediately reached for the gun after he set it down, the claim that he started to leave without the gun was inconsistent with the purported plan for defendant to take the gun when he left. This testimony further undercut his claim that he shot W.T. in a self-defense scenario.

Finally, although there was substantial evidence for purposes of supporting an imperfect self-defense instruction, the physical evidence did not entirely align with his story. Again, the knife was found on the table — not the floor. And unlike the surrounding area, the knife had no blood on it. Further, that W.T. was shot nine times on the left side of his face and head, with some wounds "quite closely grouped," is indicative of a personal motive, rather than panicked self-defense.

Given the overwhelming evidence, we conclude there was no reasonable possibility the error contributed to the verdict, and therefore the failure to instruct was harmless under either standard of prejudice.

This modification order does not change the judgment.


FOR THE COURT:


_____/s/_____
RAYE, P. J.


_____/s/_____
MURRAY, J.


_____/s/_____
RENNER, J.

5

Filed 11/10/21 (unmodified opinion)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| THE PEOPLE, | C087191 |
| Plaintiff and Respondent, | (Super. Ct. No. F16000111) |
| v. | |
| JASON CARL SCHULLER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Nevada County, Candace S. Heidelberger, Judge. Affirmed.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Michael P. Farrell, Senior Assistant Attorney General, Daniel B. Bernstein, Supervising Deputy Attorney General and Peter H. Smith, Deputy Attorney General, for Plaintiff and Respondent.

Defendant, Jason Carl Schuller, shot his long-time friend, W.T., nine times in the head and set the body on fire. Defendant testified, claiming self-defense, but his trial testimony about what happened leading up to and during the shooting suggested he was delusional and hallucinating. Following a plea of not guilty by reason of insanity, a jury found defendant guilty of first degree murder in the guilt phase. He was ultimately found legally sane and sentenced to an aggregate term of 50 years to life.

On appeal, defendant contends the trial court erred in refusing to instruct the jury on voluntary manslaughter based on imperfect self-defense. He maintains substantial evidence demonstrates he had an actual, albeit unreasonable, belief in the need for self-defense that was not entirely delusional. We agree but find the error harmless.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Prosecution's Case

The night of the murder, W.T.'s daughter, who lived in a separate upstairs unit with her kids, heard banging sounds like metal hitting metal coming from W.T.'s residence. She tried calling W.T. and then heard a very loud noise that shook the house.[2] She then saw defendant's car speed off. Her father did not answer her phone calls.

A neighbor testified he heard gunshots coming from W.T.'s residence — a first set of multiple gunshots, "six, ten" and a couple minutes later, a second set of three. He then heard and saw defendant's car speeding off. Seeing smoke coming from the house, the neighbor went inside and found W.T.'s body. After extinguishing the fire, he called 911.

Police dispatched to a report of a drunk driver, ultimately saw and pursued defendant's car for an hour, over a span of 38 miles, running red lights and reaching

---

[2] A fire chief testified that this noise was consistent with ignitable liquid being lit and vapor flashing.

speeds of 100 miles per hour. After strip spikes were deployed to puncture the car's tires, defendant kept driving for a mile, but he eventually stopped. After an approximately one- hour-long standoff, defendant surrendered after a SWAT team and an armored vehicle were deployed. He was arrested. The semi-automatic handgun used in the shooting was found in the car.

W.T. sustained nine gunshot wounds to the left side of his face and head and post-mortem burns.[3] Some of the nine head wounds were "quite closely grouped." Thirteen shell casings were found on the floor in the vicinity of the body.[4] A gun case, empty magazine, gas can, and large kitchen knife were found on the kitchen table. There was blood spatter on the walls and floor, but not on the knife. A cell phone belonging to W.T. was found under the table. There was a bullet hole in the phone. The neighbor testified that when he went inside, he could smell gas, the oven door was open, and "the gas was on full," and the burners were on as well.

The neighbor also testified that around January or February, W.T. said he did not want defendant to come around, but did not say why. At some point after that, defendant told the neighbor he was gay and coming out of the closet and he thought his father would be mad at him.[5] The neighbor did not believe W.T. was gay.

---

[3] The pathologist testified that five of the head wounds were to the left side of W.T.'s face. The bullet trajectories were from left to right, front to back, some slightly downward and some slightly upward. There was a tenth wound to the head that was probably the result of a ricochet, with a right to left, front to back and downward trajectory. There was also a gunshot wound to the back of his left hand that appeared to have been caused by a bullet that went through W.T.'s head.

[4] The gun found in defendant's car had the capacity of holding 10 rounds plus one in the chamber. When it was found, it was loaded, with one round in the chamber and six in the magazine.

[5] In the prosecution rebuttal case, the neighbor's wife testified that her husband told her defendant said he was gay and coming out at some point before W.T.'s murder.

## The Defense's Case

The defense introduced evidence through defendant's own testimony, the testimony of his sister and two police officers who briefly detained him that he was experiencing delusions and hallucinations while in Nebraska and travelling back to California in the weeks before the murder. These included that he was being shot at and attacked with Ninja stars, but was protected by "the light." During his testimony, defendant explained that "the light" was a gift from God that protected him from harm and, when shared with others, would make them better. He also testified that demons were trying to steal the light and misuse it.

Defendant testified that when he returned to California, he went straight to W.T.'s house. Defendant testified that after arriving there, they each drank two or three beers[6] and a couple of shots and took a couple of hits of concentrated THC, while defendant told W.T. about his trip. At one point, defendant shared the light with him. Defendant testified that W.T. looked surprised and said to people outside the window, "Yes, it is him."

Defendant testified that he then took a shower and, while showering, heard five "subtle" gunshots and saw a misty figure. He subsequently asked W.T. if he had shot at him, but W.T. seemed confused and ignored the question.

Later, W.T. brought out a gun and put it in a case by the kitchen table. It was defendant's gun that he had been storing at W.T.'s house. W.T. asked defendant to take it with him when he left, and defendant planned to do so.

W.T. then asked defendant to share the light again. Defendant testified that W.T. expressed a fondness for children and defendant thought the light would "cleanse" that evil out. Normally when defendant would share the light it would return to him. On this

---

[6] Law enforcement found empty beer bottles on the kitchen table.

occasion, however, "he was able to hold it. I wasn't able to get it back." W.T. then looked outside, and smiling, said, " 'See, I told you I could take it from him.' "

Defendant testified W.T. then got a knife from a kitchen drawer. Defendant tried to leave through some French doors, but they wouldn't open. He then ran to the kitchen table to put something between him and W.T. Defendant testified that W.T. then approached and "went to stab at me," but "when he was in the air he couldn't get any closer" apparently because there was a large white angel there protecting defendant. Defendant grabbed the gun from the table, pointed it at W.T., and said, " 'Tell me right now. Are you Lucifer?' " W.T. nodded yes. Defendant said he put the gun down and said sarcastically something like, " 'Yeah, right dude. . . ha, ha, You're not Lucifer.' "

Defendant testified, "[a]s soon as I set the gun down he went for the gun and raised the knife and tried like that[7] and I remember just picking it back up and taking a step or two back and pulled the trigger." Defendant testified he fired just one shot, striking W.T. in the head. W.T. fell to the floor and the knife fell out of his hand. Defendant testified he was in fear for his life when W.T. came at him with the knife.

Defendant testified, "I remembered walking, saw him at the side of the table." He asked W.T. why he did that. W.T. pushed himself up and said something to defendant like "You f'd up" or "You f'er." Describing W.T.'s movement defendant said, "It was all like one motion like push yourself up, getting to your knees, grabbing something at the same time." (RT 1141) Defendant testified, "I don't remember if he grabbed the knife and somehow it got back on the table but he was like pushing himself up." At that point, defendant jumped back and shot W.T. five more times in the head.

Defendant testified he sat on a chair, confused about what had just happened. He then tried to use W.T.'s house phone to call 911, but it was not working. Next, he tried to

---

**7** The motion W.T. purportedly made was not described for the record.

5

use W.T.'s cell phone, but was having trouble unlocking it. At the same time, the cell phone was ringing, "It just didn't stop."

Defendant testified he heard a gasp and W.T.'s dentures then flew out of his mouth. That scared defendant and he "jumped back in the chair and pulled the trigger three more times," but he did not see the bullets hit W.T.'s head. Defendant noticed the slide on the gun was back. He testified, "I remember dropping the magazine out, putting another one in and letting the slide slide forward one more in the chamber."

Defendant testified he continued to try to use W.T.'s cell phone, but it would not stop ringing, so he shot it. He recalled shooting at it three times and hitting it on the third shot.

As he was about to leave, defendant testified he saw W.T.'s body convulsing with demons swirling around it. He started to run out the door and noticed a gas can by a weedeater. He decided to "kill the demon or Lucifer [and] send it to hell" by setting the body on fire. He doused the body with gasoline, lit a cigarette, took a few "drags" from the cigarette and then set the body on fire.[8]

Defendant then drove away, planning to go Monterey, which is where he had planned to go after leaving W.T.'s house. He eventually noticed a helicopter and police cars chasing him. He testified that when he was surrounded by police, he shared "the light" with himself, and voluntarily surrendered since he believed the police could not get any closer.

On cross-examination, defendant testified that when he first pointed the gun at W.T. and asked if he was Lucifer, W.T. was holding the knife to his side. Defendant testified that he put the gun on the table and he began to walk toward the front door in the

---

[8] Defendant denied lighting the stove burners or oven. He said W.T. had them on to keep the house warm. After setting the fire, defendant said he tried to turn the burners off, but was frantic and panicked and could not figure out how to do that.

living room. He said he "just wanted to leave." Defendant testified that it was at that point that W.T. raised the knife again and then reached for the gun on the table. Although he was leaving, defendant testified, he "kind of came back at the same time like I knew I couldn't get out of there without getting stabbed." He said he was able to get the gun because he was closer. At that moment, W.T. lunged toward defendant with the knife and defendant shot him.

Also on cross, when the prosecutor asked if the killing had something "to do with some type of gay issue," defendant responded, "Absolutely not." He denied it had anything to do with W.T. rebuffing his advances. He also denied being gay, and having told a neighbor he was gay. When asked if he had initially told police he shot W.T. "out of some kind of delusional, crazy self-defense," defendant acknowledged he had not. He also acknowledged he told the police the shooting had something to do with W.T. being gay and coming on to him — though he testified that was a lie. During further cross-examination on the next day's court session, defendant testified that overnight he thought about what his thinking might have been about what he had told the police and claimed he lied about that because he thought "the gay thing" would have been "more justifiable for what happened. . . . I thought it would be justifiable. That is why I told them the gay thing."

**The Prosecution's Rebuttal**

Defendant's jail calls were monitored, and a detective testified that in his initial conversations, defendant appeared lucid and normal. But once it became clear defendant was going to pursue a mental health defense, defendant's conversation changed. From then on, defendant's conversation exhibited "conspiracy theory type language" involving the government and law enforcement framing him and "angels and demons [were] effecting things in his every day life."

A forensic psychologist opined that defendant was "exaggerating or feigning psychiatric distress." This opinion was based on a variety of reports he read

associated with the case, interviews he did with defendant as well as psychological testing he administered. The psychologist did not believe defendant was mentally ill, but his extensive drug use could have caused hallucinations. He believed defendant setting fire to the body and evading police demonstrated knowledge of wrongdoing and an understanding of consequences.

Another forensic psychologist testified that, while defendant claimed to be hallucinating, he described the shooting as a response to W.T. attacking him with a knife while trying to grab the gun, suggesting he acted in self-defense. He told her he took the gun with him when he left the house in case he needed it to have a shootout with the police or kill himself. In her experience, the hallucination of seeing demons is unusual for people with mental health issues and it caused her to be suspicious. She also noted that in one of defendant's jail phone conversations shortly after defendant was booked in the jail, he talked about his case, but made no mention of psychiatric symptoms, hallucinations, seeing demons or any of the problems defendant described to her during interviews. She concluded defendant was malingering and his efforts to destroy the body and flee from police demonstrated he knew what he did was wrong.

### Defense Request for an Imperfect Self-Defense Instruction

During the guilt phase, the defense requested an instruction on voluntary manslaughter based on imperfect self-defense. The trial court denied the request. While noting that actions based solely on delusion cannot form the basis for imperfect self-defense, the court examined the evidence to determine whether defendant's delusions could be separated from his testimony of being attacked by W.T. It concluded that in defendant's case all the "statements and the conduct which defendant attributes to [W.T.] are all . . . part of and arise out of defendant's delusions and hallucinations." It noted, "[T]here was no light being shared . . . There wasn't a light that [W.T.] held onto and wouldn't give back. [W.T.] is not Lucifer."

8

The court added:  "In addition, the physical evidence, specifically, where the knife was located, the fact that there were no blood spatters on the knife, that's not supportive of the defendant's statements that [W.T.] actually had a knife.  Even though credibility is for the jury to determine, based upon the evidence, the fact that he was in a delusion, and that the physical evidence doesn't match the self-defense allegation or contention, to me it seems like it was pretty delusional.  [¶]  So, to me — and even if [W.T.] had picked up a knife as testified to by the defendant, it doesn't seem to me that this is a situation where the defendant misperceived an objective actual circumstance that required a defensive action.  It seems more like it's a situation where his reaction was produced by the mental disturbance alone, which is the very thing that the cases talk about as being the sanity phase, not for the guilt phase."  The court reasoned that it was not making a credibility determination in lieu of the jury, but noted "there has to be some evidence to support the self-defense" and there was none in the court's view.  The court further explained:  "I don't think that the evidence supports that [W.T.] was holding the knife.  That, I think is the key.  If the evidence had been different, if the knife had been on the ground, perhaps, that might have made a difference."

Based on that reasoning, the trial court concluded there was no basis to support an imperfect self-defense instruction.

### Verdict, Sanity Phase, and Sentencing

The jury found defendant guilty of first degree murder (Pen. Code, § 187, subd. (a))[9] and found he personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).

After the sanity phase, the jury was unable to reach a decision and was discharged.  A second jury later found defendant legally sane at the time of the shooting.

---

[9]  Undesignated statutory references are to the Penal Code.

9

The trial court thereafter imposed an aggregate term of 50 years to life, consisting of 25 years to life for the murder and 25 years to life for the firearm enhancement.

## DISCUSSION

Defendant contends the trial court erred in refusing to instruct the jury on the lesser included offense of voluntary manslaughter based on a theory of imperfect self-defense. He argues that despite making many delusional claims at trial, he testified to a relatively straightforward claim of self-defense: W.T. attacked with a knife and he shot in self-defense.

We agree defendant was entitled to the instruction, but find the error harmless.

### I. Delusions, Hallucinations, and Imperfect Self-Defense

When there is substantial evidence that the defendant killed in imperfect self-defense, the trial court must instruct on this theory of voluntary manslaughter. (*People v. Elmore* (2014) 59 Cal.4th 121, 134 (*Elmore*); *People v. Breverman* (1998) 19 Cal.4th 142, 162.) In this context, substantial evidence is " ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater, was committed." (*Breverman*, at p. 162.) " '[S]ubstantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself.' " (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137 (*Millbrook*).) "In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses." (*Breverman,* at p. 162.) That is a task for the jury. (*Ibid.*) We review the trial court's refusal to instruct on a lesser included offense de novo and, in so doing, consider the evidence in the light most favorable to the defendant. (*People v. Campbell* (2020) 51 Cal.App.5th 463, 501 (*Campbell*); *People v. Brothers* (2015) 236 Cal.App.4th 24, 30 (*Brothers*); *Millbrook,* at p. 1137.)

10

Voluntary manslaughter based on imperfect or unreasonable self-defense is available to a defendant who had an actual, but unreasonable, belief in the need for self-defense. (*Elmore*, *supra* 59 Cal.4th at pp. 121, 129.) It mitigates murder to manslaughter because malice " 'cannot coexist' " with an actual, although mistaken, belief in the need to defend oneself from the victim's imminent attack. (*Id.* at pp. 129-130.)

As our high court in *Elmore* explained, "unreasonable self-defense involves a misperception of *objective circumstances*, not a reaction produced by mental disturbance *alone*." (*Elmore*, *supra*, 59 Cal.4th at pp. 134-135.) " '[U]nreasonable self-defense 'is based on a defendant's assertion that he lacked malice . . . because he acted under an unreasonable *mistake of fact*—that is, the need to defend himself against imminent peril of death or great bodily harm.' " (*Id.* at p. 136.) And "because unreasonable self-defense is 'a species of mistake of fact [Citation] . . . it cannot be founded on delusion.' " (*Ibid.*)

Thus, "unreasonable self-defense, as a form of mistake of fact, has no application when the defendant's actions are *entirely* delusional. *A defendant who makes a factual mistake misperceives the objective circumstances. A delusional defendant holds a belief that is divorced from the circumstances.*" (*Elmore*, *supra*, 59 Cal.4th at pp. 136-137, italics added.)[10] But the *Elmore* court was careful to note: "[a] defendant who misjudges the external circumstances may show that mental disturbance contributed to the mistaken

---

[10] The *Elmore* court explained how the law regards a purely (or entirely) delusional belief in self-defense: "[A] belief in the need for self-defense that is purely delusional is a paradigmatic example of legal insanity." (*Elmore*, *supra*, 59 Cal.4th at p. 135.) It "is quintessentially a claim of insanity under the *M'Naghten* standard of inability to distinguish right from wrong. Its rationale is that mental illness caused the defendant to perceive an illusory threat, form an actual belief in the need to kill in self-defense, and act on that belief without wrongful intent." (*Id.* at p.140.) Thus, where the defense is that defendant acted *purely* on a delusional belief in the need for self-defense, such a claim is reserved for the sanity phase, where it may result in complete exoneration from criminal liability. (*Id.* at pp. 145, 147.) However, such a claim "may not be employed to *reduce* a defendant's degree of guilt." (*Id.* at p. 145.)

11

perception of a threat," and thus "defendants who mistakenly believed that actual circumstances required their defensive act may argue they are guilty only of voluntary manslaughter, *even if their reaction was distorted by mental illness*." (*Id.* at p. 146, italics added.)

So, in deciding whether substantial evidence supports an instruction on unreasonable self-defense, where must a court draw the line? The *Elmore* court explained: "The line between mere misperception and delusion is drawn at the absence of an *objective correlate*." (*Elmore*, *supra*, 59 Cal.4th at p. 137, italics added.) For example, "[a] person who sees a stick and thinks it is a snake is mistaken, but that misinterpretation is not delusional. One who sees a snake where there is nothing snakelike, however, is deluded." (*Ibid*.) Given the *Elmore* court's distinction between "misperceive[ing] objective circumstances," and holding a belief that is "divorced from the circumstances," and its snake example, we understand the reference to "an objective correlate" to relate to the presence or absence of objective circumstances supporting a claim of imperfect self-defense.

So, who may testify about the objective circumstances and what type of proof is required? As the court noted in *People v. Ocegueda* (2016) 247 Cal.App.4th 1393 (*Ocegueda*), in a slightly different context, no corroborating evidence is required beyond a defendant's statement or testimony. (*Id.* at pp.1409-1410 .) It is for the jury to decide whether a defendant is credible. (*Id.* at p. 1409.) Thus, a single witness, including the defendant, can provide evidence establishing the objective circumstances necessary to support the instruction. (*Id.* at pp. 1401, 1409.) We apply these principles here.

## II. Analysis

We conclude the refusal to instruct on imperfect self-defense here was error. While defendant's testimony included evidence of delusion, his account pertaining to the actual shooting was not *entirely* delusional and thus provided substantial evidence of an actual but unreasonable belief in the need for self-defense.

12

This case stands in contrast to *Elmore,* which exemplified conduct "produced by mental disturbance *alone*" and a belief that was "divorced from the circumstances." (*Elmore*, *supra*, 59 Cal.4th at pp. 134, 137.) There, the defendant — who by all accounts was mentally ill — attacked a middle-aged woman, a stranger who was merely out to go shopping. (*Id*. at p. 130.) While she was sitting at a bus stop, defendant approached her and stabbed her to death with a sharpened paint brush handle. (*Ibid*.) A witness did not see the victim do anything to defendant before he attacked her. (*Ibid*.) At trial, defendant testified, that " 'somebody was saying something violent to me.' " (*Id*. at p. 131.) Asked who, defendant said, " 'some person out there,' " but could not say whether the person was a man or woman. (*Ibid*.) When asked why he stabbed the victim, he testified, " 'Person said something and did something to me, I didn't just go do it to be doing it.' " (*Ibid*.) Like the court's snake example, nobody was threatening defendant — the threatening person was the product of defendant's delusional state. Admitting there was no factual basis for defendant to believe he had to defend himself, defense counsel nevertheless asked for an instruction on unreasonable self-defense, "based *solely* on [the] defendant's delusional mental state." (*Id*. at pp. 131-132, italics added.) Our high court rejected that theory, holding that the doctrine of unreasonable self-defense is not available when the belief in the need to defend oneself is *entirely* delusional. (*Id*. at p. 130.) "A purely delusional belief in the need to act in self-defense may be raised as a defense, but that defense is insanity." (*Ibid*., see fn. 9, *ante*.)

Here, the parties and the trial court struggled with the lack of published authority covering a situation such as presented here. No published case has addressed a court's refusal to give an imperfect self-defense instruction where a defendant's story is that a real person attacked him, but there are delusional components to the defendant's description of what happened.

*Ocegueda*, *supra*, 247 Cal.App.4th 1393, however, provides some guidance. Applying *Elmore*, the *Ocegueda* court held that the trial court erred by precluding the

13

jury from considering evidence of defendant's mental disabilities in deciding whether he harbored the state of mind required for imperfect self-defense. (*Id*. at p. 1396.) In *Ocegueda*, the defendant told police the victim had been " 'mad dogging' " him and making derogatory comments. (*Id*. at p. 1401.) At one point, the victim appeared to reach under his coat and pull out "something metal." Thinking the victim was pulling out a gun, defendant shot the victim " 'for [his] own protection.' " (*Id*. at pp. 1397, 1401.) The defendant had been diagnosed with a developmental disability, and an expert testified that people with "processing disorders [like defendant] might have problems with interpreting what they see or hear, or it might take them longer to arrive at a conclusion about what they see or hear." (*Id*. at p. 1402.) The trial court instructed on imperfect self-defense, but did not instruct the jury that it could consider evidence of the defendant's mental disabilities in deciding whether he had the state of mind required for imperfect self-defense. (*Id*. at pp. 1404-1405)

Relying on *Elmore*, the Attorney General in *Ocegueda* argued that even if the defendant had a genuine belief in the need to defend himself, the belief must have been purely delusional because no other witness saw the victim move as defendant described and no weapon was found. (*Ocegueda*, *supra*, 247 Cal.App.4th at p. 1409.) To this, the *Ocegueda* court wrote: "We do not read *Elmore* as precluding imperfect self-defense in any case where mental disabilities affect the defendant's beliefs or perceptions. The key distinction identified in *Elmore* is the 'absence of an objective correlate.' " (*Ibid*.) The court continued: "Based on defendant's statements, the jury reasonably could have inferred that [the victim] actually made some threatening motion or pulled out a metallic object, such as a cell phone, from his waistband. Whether defendant's statements were sufficiently credible or his beliefs purely delusional were questions of fact for the jury to decide. *Elmore does not establish a heightened evidentiary standard requiring corroborating evidence independent of defendant's statements to show his beliefs were not purely delusional*." (*Id*. at pp. 1409-1410, italics added.)

14

Here, like Ocegueda's uncorroborated claim that he thought the victim was pulling out a gun, defendant testified that W.T. came at him with a knife, while reaching for the gun on the table, prompting him to shoot in self-defense. While there were delusional components to defendant's story (the "light" being taken from him, and whether W.T. was Satan), his claim was not entirely delusional like in *Elmore* or the *Elmore* court's snake example. Defendant testified that the person he shot was W.T. and that he did so because W.T. came at him with a knife. *Elmore* contemplates that imperfect self-defense is available here: "defendants who mistakenly believed that actual circumstances required their defensive act may argue they are guilty only of voluntary manslaughter, *even if their reaction was distorted by mental illness*." (*Elmore, supra*, 59 Cal.4th at p. 146, italics added.)

Indeed, we think it important that although defendant questioned whether W.T. was Lucifer just before the shooting, he dismissed the idea. He did not testify that Lucifer was trying to kill him or that when he pulled the trigger, he thought he was shooting Lucifer. Defendant testified it was W.T. he shot, not because he had taken "the light," but rather because W.T. came at him with a knife. Considering this evidence in the light most favorable to the defendant, we must conclude that despite whatever delusion his testimony suggests he was acting under, he was not entirely delusional.[11]

---

[11] This distinguishes *People v. McGehee* (2016) 246 Cal.App.4th 1190, a case the trial court relied upon. In *McGehee*, another panel of this court addressed the question of whether a defendant who had been delusional was entitled to an instruction on involuntary manslaughter. There, a mentally ill defendant stabbed his mother to death and sought an involuntary manslaughter instruction based on the theory that he thought she was a demon and not a human being. (*Id*. at pp. 1194, 1208.) Acknowledging that "instructions on involuntary manslaughter are required where there is substantial evidence that may come in the form of evidence of the defendant's mental illness, raising a question as to whether or not that defendant actually formed the intent to kill," the court concluded that there was no serious dispute that defendant intended to kill when he inflicted 10 stab wounds in an attack the medical examiner described as "overkill." (*Id*. at p. 1208.) The court then observed that the defendant was not claiming he lacked an

15

And further, a jury could have inferred from defendant's testimony he had an actual belief in the need to defend himself, but that belief was unreasonable given he had a gun and W.T. — on the other side of the table — had only a knife. Or the jury could have reasonably determined that after firing the initial shot, defendant did not need to shoot W.T. multiple times in the head and thus he reacted unreasonably by doing so when W.T. tried to get up from the floor after having dropped the knife, especially in light of defendant's inability to say whether W.T. had the knife in his hand at that time.

Thus, defendant's own testimony, even though uncorroborated and not otherwise credible, supported an instruction on actual but unreasonable belief in the need for self-defense. As the *Ocegueda* court noted, "a single witness, even if not inherently credible, may provide sufficient evidence to establish a fact" supporting the instruction and "*Elmore* does not establish a heightened evidentiary standard requiring corroborating evidence independent of [the] defendant's statements to show his beliefs were not purely

intent to kill and went on to write: "Instead, defendant argues: 'If [he] believed, due to a hallucination or delusion, that he was being tormented and attacked by a demon, as he had hallucinated in the past, the killing would be without express or implied malice, because he did not believe that he was acting against a human life.' This argument is foreclosed by the reasoning of *Elmore*, *supra*, 59 Cal.4th 121." (*Ibid.*) Under *Elmore*, the *McGehee* court concluded such a claim could only be addressed in a sanity phase after a plea of not guilty by reason of insanity. (*Id.* at pp. 1209-1211.) Acknowledging that *Elmore* presented a different question which concerned voluntary manslaughter instructions grounded on a claim of imperfect self-defense, the *McGehee* court stated in dicta: "Defendant does not argue he was entitled to voluntary manslaughter instructions because substantial evidence supported the view he hallucinated an attack by a demon, and therefore actually, although unreasonably, believed in the need to use deadly force in self-defense. Such an argument would be foreclosed by the holding in *Elmore*." (*Id.* at p. 1210.) We need not consider whether *Elmore* actually would foreclose imperfect self-defense in any particular case where a defendant believes he is being attacked by a demon. Each case would require consideration of its own circumstances. As for the instant case, looking at the evidence in a light most favorable to defendant, we conclude the evidence established that when defendant shot W.T., he believed it was W.T. who was attacking him and he intended to kill W.T. based on his belief self-defensive actions were necessary to avoid being stabbed.

delusional." (*Ocegueda*, *supra*, 247 Cal.App.4th at pp. 1409-1410.)

And even if such corroboration was required, it is present here. Beyond the circumstance that defendant knew it was W.T. he was shooting, there was the objective circumstance corroboration that a large knife was found on the kitchen table. Additionally, a gun case was on the table, which corroborated defendant's testimony that that was where the gun had been located just before he grabbed it.

Of course, the jury was free to reject defendant's self-defense testimony as unsupported or unreliable. (*Ocegueda, supra,* 247 Cal.App.4th at p. 1409.) That the knife was found on the table, not the floor, and had no blood spatter on it were facts the jury could consider along with defendant's story. But the trial court erred in relying on those circumstances to conclude defendant was purely delusional.[12] "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence" (*People v. Salas* (2006) 37 Cal.4th 967, 982), and a court is not permitted to concern itself with inconsistencies in the evidence (*Millbrook, supra,* 222 Cal.App.4th at p. 1137), rather the court must "consider the evidence in the light most favorable to the defendant." (*Campbell*, *supra*, 51 Cal.App.5th at p. 501; *Brothers, supra,* 236 Cal.App.4th at p. 30; *Millbrook,* at p. 1137.)

Therefore, we conclude the trial court erred in refusing to instruct on voluntary manslaughter based on imperfect self-defense.

---

[12] We understand the trial court to have reasoned this inconsistency between defendant's testimony and the physical evidence established that defendant was entirely delusional. But defendant testified about other facts that demonstrated he was in touch with reality. For example, after shooting W.T., he noted that the slide on his semi-automatic handgun was back, indicating that the gun was empty, so he dropped the empty magazine and reloaded with a magazine that had additional ammunition in it. Also, defendant realized the phone was ringing, because it was, in fact, ringing — Defendant's daughter was calling. Moreover, in his testimony, defendant allowed for the possibility that the knife was in W.T.'s hand when he pushed himself up and it wound up on the table, although he was unable to say for sure where the knife was at that time.

17

### III. Harmless Error

Defendant argues the error was prejudicial because there was a reasonable chance the jury would have convicted him of voluntary manslaughter had it been instructed on imperfect self-defense. We disagree.

Failure to instruct on a lesser included offense is analyzed under the harmless error test in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 195-196 (*Gonzalez*); *Breverman, supra,* 19 Cal.4th at p. 149.)[13] " '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 955.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is l*ikely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Beltran,* at p. 956.)

Here, a more favorable result was not reasonably probable given the overwhelming evidence that defendant was not acting in any form of self-defense. Defendant's account of the killing radically changed leading up to trial. Shortly after he

---

[13] Defendant maintains the standard from *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705], should apply because the error violated his constitutional rights. He argues that California has only held that failure to instruct on lesser included offenses is to be reviewed under *Watson* in non-capital cases, and he is not entitled to fewer rights because he is not facing capital punishment. We disagree. (*Gonzalez*, *supra*, 5 Cal.5th 186, 195,198 ["The failure to instruct on lesser included offenses supported by substantial evidence was state law error"; "Although we have long recognized the duty to instruct on lesser included offenses under *California* law, neither we nor the United States Supreme Court recognizes a similar duty to instruct on lesser included offenses under *federal constitutional* law—at least in noncapital cases"].)

was apprehended, he implied to law enforcement that W.T. was gay and coming on to him — defendant said nothing of killing in self-defense. But during trial, defendant told the jury he lied to the police because he thought "the gay thing" would have been "more justifiable for what happened," an excuse a reasonable jury would likely find unconvincing and evincing a willingness to create a story to justify his actions.

Two forensic psychologists testified that defendant appeared to be malingering. One testified that psychological testing designed to determine whether a person is malingering or exaggerating psychiatric symptoms supported this conclusion. The other testified that hallucination of demons is unusual for people with mental health issues. She also noted that in a recorded jail conversation shortly after defendant's arrest, defendant talked about his case without mentioning hallucinations or demons or any of the problems he described during interviews with her. Similarly, a detective testified that defendant seemed lucid in his earlier recorded jail phone conversations, only to later exhibit delusions about government conspiracies, angels, and demons after it "became clear" he would pursue a mental health defense. The testimony of the psychologists undercut the credibility of the claim he acted in self-defense, as well as the credibility of his claim he was suffering from delusions or hallucinating.

Defendant's attempt to destroy the body (and perhaps the house) and his flight also undercut his claim of self-defense. Indeed, there was an inherent contradiction in defendant's testimony that he tried to call the police after the shooting, only to be stymied by the ringing phone — yet, when police found him, rather than seek their help, he led them on a 38-mile pursuit, surrendering only after his car was rendered inoperable and an hour-long standoff had ensued.

Indeed, a reasonable jury likely concluded defendant had the opportunity to get help while he was at or near the house — if he really wanted it. Defendant testified he wanted to call 911 but had trouble unlocking W.T.'s phone to do so. But when someone called (the daughter said she called numerous times after hearing noises), instead of

19

answering the phone and asking the caller to get help, defendant shot the phone to make it stop ringing. Shortly thereafter, he fled without summoning help from anyone nearby, leaving the house to burn down.

Other aspects of defendant's testimony undercut his credibility. Defendant testified he set the gun on the table, even though W.T. still had a knife in his hand. A reasonable jury would likely have found defendant's purported unilateral disarmament by setting the gun down to lack credibility. He testified on direct examination that "as soon as" he set the gun down on the table, W.T. went for it and raised the knife. Yet, on cross-examination the following day, he testified that after he put the gun on the table, he started to walk away toward the front door because "he just wanted to leave." Aside from disproving his earlier testimony indicating W.T. immediately reached for the gun after he set it down, a jury could have reasonably found the claim that he started to leave without the gun to lack credibility because the purported plan had been for him to take the gun with him whenever he left; putting the gun on the table and then leaving did not square with that plan. This testimony further undercut his claim that shot W.T. in a self-defense scenario.

Finally, although there was substantial evidence for purposes of supporting an imperfect self-defense instruction, the physical evidence did not entirely align with his story. Again, the knife was found on the table — not the floor. And unlike the surrounding area, the knife had no blood on it. Further, that W.T. was shot nine times on the left side of his face and head, with some wounds "quite closely grouped," suggested a personal motive, rather than panicked self-defense.

Again, our focus in a *Watson* review is "not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error." (*Beltran*, *supra*, 56 Cal.4th at p. 956.) Given the evidence, we conclude there was no reasonable chance of a more favorable outcome had the jury received the requested instruction.

20

## DISPOSITION

The judgment is affirmed.

/s/
_____
MURRAY, J.

We concur:


/s/
_____
RAYE, P. J.


/s/
_____
RENNER, J.

21