Filed 8/17/22  P. v. Zaragoza CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C094155 |
| Plaintiff and Respondent, | (Super. Ct. No. 19FE014051) |
| v. | |
| CARLOS VICTOR ZARAGOZA, | |
| Defendant and Appellant. | |

In 2007, the victim was 14 years old.  During a family gathering, defendant Carlos Victor Zaragoza, who was married to the victim's cousin, suggested the victim accompany him to a convenience store.  On the way, they stopped in a vacant lot. Defendant drank brandy and offered some to the victim.  Defendant then forced the victim against a fence, kissed her, and digitally penetrated her vagina.  Years later, the victim reported the incident to law enforcement.  Law enforcement had the victim place a pretext call to defendant about the incident.  Defendant was charged with a single count of sexual penetration by a foreign object by means of force, violence, duress, menace, and fear of immediate and unlawful bodily injury.  The jury found him guilty.

1

On appeal, defendant asserts (1) the trial court erred in instructing the jury with CALCRIM No. 357 on adoptive admissions, (2) relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, that the trial court abused its discretion in imposing a restitution fine above the statutory minimum and in imposing certain other fines and fees over his objection and without making a finding that he had the ability to pay, and (3) that, following enactment of Assembly Bill No. 1869 (2019-2020 Reg. Sess.), the $453.62 main jail booking fee and the $90.65 main jail classification fee imposed by the trial court pursuant to former Government Code section 29550.2 must be stricken.

We shall vacate the main jail booking fee and the main jail classification fee, modify the oral pronouncement of judgment to reflect the imposition of certain fines and fees, and affirm the judgment as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

In an amended information, defendant was charged with a single count of sexual penetration by a foreign object by means of force, violence, duress, menace, and fear of immediate and unlawful bodily injury. (Pen. Code, § 289, subd. (a)(1).)[1]

### *The Trial*

The victim's parents were Armenian, and they moved to the United States in 1990. The victim was born in 1992. The victim grew up in a strict, conservative home. At the time of the 2021 trial, she was 28 years old.

On May 12 or 13, 2007, when the victim was 14, there was a family gathering at the victim's house to celebrate the birthday of one of her sisters. Defendant, who was married to one of the victim's cousins, was at the party, as he often attended family gatherings. At some point, the victim went to the front yard and saw defendant there.

---

[1]     Further undesignated statutory references are to the Penal Code.

2

Defendant was going to the convenience store and asked if the victim wanted to go with him. He offered the victim a snack or some candy, and she agreed to go with him.

As they began to walk to the store, the victim realized they were taking the long way, making "an entire loop around the neighborhood first." The victim suggested going the other way, but defendant "just said let's go this way instead," and the victim "followed his lead." They went on a route that did not have "visibility from [the victim's] house." Their walk took them into an empty lot or dirt field.

After they walked into the field, defendant veered right and sat down on the ledge of a wooden fence. The victim sat down next to him, again, just following his lead. The victim thought it was strange that they would stop there on the way to the convenience store. She had "a strange feeling in [her] gut, but [she] didn't think anything of it."

After they sat down, defendant took out a bottle of brandy and took a drink. Defendant offered the victim a drink. She had never had alcohol before, but, feeling pressured, she "touched it a little to [her] tongue." She "just tasted it on [her] lips" and gave the bottle back to defendant. Defendant chugged from the bottle and then tossed the bottle into the field. Defendant seemed "a little under the influence."

After defendant threw the bottle into the field, the victim stood up, thinking that they would proceed to the convenience store. Instead, defendant pushed the victim up against the fence and started kissing her neck and lips. The victim tried to pull away, but defendant used his body and pushed her further against the wall. The victim told defendant "no." Defendant responded by whispering in the victim's ear, telling her to "shush" and telling her that she was "a bad girl, and [she] was naughty and dirty and things like that." Defendant placed his hands between her legs. The victim was wearing a skirt and defendant touched her vagina over her underwear. The victim tried to resist with her knee, but he "just kept going at it." Then defendant put his hands inside her vagina. The victim told defendant to stop and said, "this isn't right." She tried to use her body to push him off of her.

3

Previously, the victim never had any sexual experience with a male at all. She had never even held hands before. She testified that she understood from her strict upbringing that, if she did such things with a man and did not marry him, "then no one else would want to marry you." Therefore, when defendant had her pushed against the fence, she was thinking, "how is this happening? Why is this happening? No one is going to love me. No one is going to want to be with me anymore. What's my dad going to think?"

The victim did not recall how the incident ended. She did recall defendant telling her not to tell anyone what had happened. Either that night or on another occasion, defendant said something about the fact that she was young, and made a comment like, "call me when you're 18."

The victim and defendant never went to the store. As they were walking back to the house, they saw the victim's father as he pulled up in a car. Defendant's wife also pulled up in a car. Defendant left with his wife, and the victim's father took her home. The victim's father was really upset, which scared her. She believed that he had been worried that she was gone, but also that she had been walking with defendant. The victim believed her father blamed her for even going for a walk with defendant.

When they got home, the victim went to her room and cried. She felt that she could not tell anyone what had happened because defendant told her not to. He told her they would both get in trouble. The victim also thought that, if she revealed what had happened, she "would never get married and nobody would love [her] because [she was] damaged." She felt this would be the case even though she was not a willing participant and even if other people knew that.

After the incident, the victim continued to see defendant at family events. Their interaction was minimal. They would just "hug hello." The victim's interactions with defendant were more cautious and awkward than before.

4

When the victim was 18, defendant reached out to her to discuss things that were happening in his marriage. Defendant asked the victim if she could pick him up and give him a ride to his friend's house. The victim felt bad for him and agreed to give him a ride. She gave defendant a ride to his friend's house, where he picked up a laptop. Then they drove to a park, with defendant directing the victim where to go. Defendant said he wanted to talk. As they sat in the car talking, defendant leaned in and started to kiss the victim. She kissed him back. She felt that, if she tried to fight or resist, she could be harmed. She cared about defendant, but was not attracted to him. Defendant put his hands between the victim's legs and rubbed her vagina over her clothes. The victim "just let it happen" because she did not feel like she had any choice. This continued for a couple of minutes, and then the victim drove defendant back to his truck.

A few months later, defendant reached out to the victim again. Defendant told the victim what was going on with his marriage, including that he had been kicked out and that he did not have any food or furniture. The victim felt badly for defendant and she offered to bring him some food. The victim brought defendant a plate of food to his apartment and she went inside. They sat on the floor talking and then defendant advanced on the victim, took her hands, and placed her hands in his pants. Defendant moved the victim's hand up and down on his erect penis. Her hands were in his pants for a minute or two. She felt very uncomfortable. Defendant wanted to have sex and told the victim to take her clothes off, but she refused. She removed her hand from his pants and left.

The victim married in 2012. Her husband was the first person to whom she disclosed what had happened when she was 14. After she got married, she saw defendant in a park at some point and told him that she had told her husband everything.

Approximately two years later, the victim's brother-in-law, Tom, who was a pastor or minister, contacted the victim to discuss what had happened between her and defendant. Tom was not the victim's pastor, but she looked to him as a spiritual advisor.

Tom had been very close with defendant. The victim agreed to meet with Tom and defendant. When they met, Tom urged the victim to forgive defendant. According to the victim, at the meeting, "[w]ith [her] words [she] said [she] forgave him, but [she] walked away with a lot of anger still in [her] heart."

Eventually, after undergoing counseling, the victim decided to report what defendant had done. After she made a report to law enforcement, Sacramento County Sheriff's Office Detective Thomas Purser talked to her about making a pretext call. Before the call, he gave her examples of the type of questions she should ask, and during the call, he directed her as to what questions to ask. A recording of the pretext call, which lasted more than 30 minutes, was played for the jury.[2]

During the pretext call, the victim asked defendant if he remembered what happened "that night." Defendant asked which night the victim was referring to, and then he said, "When you were a kid? When you were a minor?" The victim responded affirmatively, and defendant then said, "I don't remember the details. Um, I remember, drinking. I remember trying to sneak off and you were right there, and I couldn't shake you. And I remember after I went to go get some more drink, you were sitting there on the log. Um, I said, Hey, let's make out, you're like sure. Fingered you, sucked some titties, and said, hey, we can't do this till you're 18. That was what I remember." When the victim asked defendant if he told his wife about that night, defendant responded, "No, I lied. I lied for my sake. Because you were 14 and 15, and I said you were a teenager, 16, 17. I did. I did lie about the age to make myself not look as bad." When the victim stated she did not know whether defendant's wife "knows about the . . . molested thing that happened," defendant responded, "Oh no, I told her your [*sic*] minor. I said, I told her I messed around with you. And I didn't say nothing about fingering you. I didn't say

---

**2**      A recording of the pretext call is part of the augmented record on appeal.

6

nothing sexual. I said I said, Hey to [the victim], do not call me until you are 18." The victim asked if defendant remembered the "whole fingering, and fingering me thing," and defendant responded, "Yeah." Later, continuing to discuss what defendant's wife knew about the incident, defendant stated, "I was not gonna throw myself under the bus completely to where I could get arrested and face charges. She's a correctional officer, your husband's a cop. I had to tread carefully." Defendant said the victim was "the only kid that [he] ever touched that was a minor . . . ." When the victim asked defendant why he did what he did, defendant responded, "Availability, availability. You were there." Asked what he was thinking, defendant said, "I wasn't. I was horny."

On cross-examination, the victim acknowledged she did not recall defendant stating during the pretext call that he *forcibly* digitally penetrated her vagina. However, when asked if defendant did, in fact, forcibly digitally penetrate her vagina, the victim responded: "Yes, he did." She also testified she did not willingly participate in the incident.

### *Verdict and Sentence*

The jury found defendant guilty of sexual penetration by a foreign object by means of force, violence, duress, menace, and fear of immediate and unlawful bodily injury. (§ 289, subd. (a)(1).) The trial court sentenced defendant to the midterm of six years. The abstract of judgment reflects that the court imposed a $1,000 restitution fine (§ 1202.4, subd. (b)), a suspended $1,000 parole revocation restitution fine (§ 1202.45), restitution to the victim in the amount of $7,100 and to the California Victim Compensation Board in the amount of $4,762.50 (§ 1202.4, subd. (f)), a $40 court operations assessment (§ 1465.8), a $30 conviction assessment (Gov. Code, § 70373), a $300 first time sexual habitual offender fine and $130 in related penalty assessments (§ 290.3), a $453.62 main jail booking fee (Gov. Code, former § 29550.2), and a $90.65 main jail classification fee (*ibid*.).

7

## DISCUSSION

## I

### *CALCRIM No. 357*

### A. Additional Background and CALCRIM No. 357

After the close of evidence, the trial court noted it had provided the attorneys with proposed jury instructions. As defendant acknowledges, the defense did not register an objection to CALCRIM No. 357. The trial court subsequently instructed the jury with CALCRIM No. 357 as follows: "If you conclude that someone made a statement outside of court that accused the defendant of the crime, and the defendant did not deny it, you must decide whether each of the following is true. One, the statement was made to the defendant or made in his presence. Two, the defendant heard and understood the statement. Three, the defendant would, under all circumstances, naturally have denied the statement if he thought it was not true, and four, the defendant could have denied it but did not. [¶] If you decide that all of these requirements have been met, you may conclude that the defendant admitted the statement was true. If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose." CALCRIM No. 357, the adoptive admission instruction, relates to an exception to the hearsay rule: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.)

### B. Defendant's Contentions and Forfeiture

Defendant asserts the trial court prejudicially erred and violated his constitutional rights by instructing the jury with CALCRIM No. 357. Defendant asserts the instruction was not supported by the evidence because, on the pretext call, he answered all of the victim's questions, never failed to provide a response, and never equivocated. He asserts

8

he made no adoptive admissions; he did not, by words or conduct, manifest his belief in the truth of any accusatory statement.

The Attorney General asserts defendant's contention is forfeited because he failed to object to CALCRIM No. 357 in the trial court. However, as the Attorney General acknowledges, "[f]ailure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights," meaning that the error "resulted in a miscarriage of justice under" *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927; § 1259; accord, *People v. McGehee* (2016) 246 Cal.App.4th 1190, 1203.) " 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087, quoting *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

### C. Instructional Error

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) The trial court also " ' "has the correlative duty 'to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues.' " ' " (*People v. Xiong* (2020) 54 Cal.App.5th 1046, 1079, quoting *People v. Alexander* (2010) 49 Cal.4th 846, 920; accord, *People v. Saddler* (1979) 24 Cal.3d 671, 681.)

The Attorney General concedes CALCRIM No. 357 was not supported by evidence that defendant made any adoptive admission admitting that he committed the crime charged. Specifically, the Attorney General concedes there was no evidence the victim or anyone else, in an out-of-court statement, accused defendant "of the crime charged here, i.e., sexual penetration *by force*," giving rise to the situation where he might make an adoptive admission to that accusation. Therefore, the Attorney General concedes CALCRIM No. 357 "was factually inapplicable." We conclude that, even assuming it was error to instruct the jurors with CALCRIM No. 357, defendant suffered no prejudice and therefore no miscarriage of justice took place.

### D. Prejudice

Defendant asserts that the instruction violated his constitutional rights and therefore prejudice must be assessed under the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24. Under *Chapman*, to determine whether the People have satisfied their burden of proving the error was harmless beyond a reasonable doubt, "we examine the entire record and must reverse if there is a ' " 'reasonable possibility' " ' that the error contributed to the verdict." (*People v. Reese* (2017) 2 Cal.5th 660, 671; *Chapman*, at p. 24.)

Relying on *People v. Chism* (2014) 58 Cal.4th 1266, the Attorney General responds that an erroneous instruction on adoptive admissions that has no application to the facts of the case is reviewed for prejudice under the standard set forth in *Watson, supra*, 46 Cal.2d at page 836. " '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955; *Watson, supra*, 46 Cal.2d at p. 836.) In *Chism*, the Supreme Court concluded that instructing the jury with CALJIC No. 2.71.5, predecessor to CALCRIM No. 357, despite the fact that the instruction had no application to the facts, was harmless under *Watson* where the jury was also instructed to disregard an instruction "that applies to facts determined not to exist." (*Chism*, at p. 1299.) Under

10

these circumstances, the Supreme Court stated the defendant's contention that the instructional error reduced the prosecution's burden of proof—a contention defendant raises here—was without merit. (*Ibid*.) We conclude the *Watson* standard applies under the circumstances here, but further will conclude any error was harmless under any standard.

The 14-year-old victim was the only witness to testify about the incident that occurred in May 2007. According to the victim, defendant offered her candy or a snack if she went with him to the store and she agreed to go. Defendant insisted on going on a longer route to the store, one which did not have visibility "from the location of [the victim's] house" where the family gathering was ongoing. They went into a vacant lot where defendant drank brandy, offered the victim a drink, and then finished the brandy. As the victim thought they were about to resume their walk to the store, defendant pushed her against a fence and kissed her neck and lips. The victim tried to pull away but could not. Defendant pushed the victim further against the fence, even as she told him "no." Defendant placed his hands between the victim's legs and touched her vagina over her underwear. The victim unsuccessfully tried to resist with her knee, but defendant "just kept going at it." Defendant put his hands inside the victim's vagina. She told him to stop and tried to use her body to push him off. The victim recalled defendant telling her, after he digitally penetrated her vagina, not to tell anyone what had happened.

In the pretext call, defendant confirmed much of what had happened. He acknowledged that the incident had occurred when the victim was a minor, 14 years old, a "little girl," and a "kid." He also acknowledged putting his fingers in the victim's vagina. Additionally, he acknowledged that he "took advantage of" the victim.

The defense's position at trial was that, while the touching occurred, it was not forcible. In his closing argument, defense counsel stated: "the defense contends strongly that [defendant] did not forcibly digitally penetrate [the victim's] vaginal opening. Yes, he was inappropriate with her and penetrated her vaginal area with his fingers. The

11

defense is not going to deny that as you heard [defendant] admit as much on the pretext." According to the defense's argument, the victim "permitted him to do this." Defense counsel subsequently reiterated that, on the pretext call, what defendant "did not admit was he used force[ ], but he did admit he was inappropriate with her."

The victim acknowledged she did not recall defendant stating, during the pretext call, that he *forcibly* digitally penetrated her vagina, a fact that arguably supports defendant's position. However, the victim testified that defendant did, in fact, forcibly digitally penetrate her vagina. She also testified she did not willingly participate in the incident. This testimony was not contradicted by any evidence presented at trial.

Defendant asserts on appeal, as defense counsel argued before the jury, that his intoxication at the time of the incident played a role in the incident and defendant suggests the evidence failed to prove he had the requisite specific intent to commit the charged offense. The victim did testify defendant was drinking brandy and he seemed "a little under the influence." However, as the Attorney General notes, the jury was instructed with CALCRIM No. 251 on specific intent and with CALCRIM No. 3426 on voluntary intoxication and nonetheless reached its guilty verdict. Moreover, relevant to defendant's specific intent and voluntary intoxication, based on the pretext call, defendant did not seem to have any difficulty remembering the events or describing what his motivation was at the time he digitally penetrated the 14-year-old victim's vagina: "I was horny." He also said he "was a dog and [he] was just thinking about one thing. That's what I was thinking about. I wasn't thinking about your feelings," and "I was

12

thinking more about your, your lust, you know, your sexual, you know, getting you horny."[3]

The jury heard the victim testify about her encounters with defendant after she turned 18, during which she allowed sexual contact to occur. Defense counsel argued these encounters undermined the victim's credibility and her representation that the 2007 incident was nonconsensual and forcible. However, the victim's description of these subsequent encounters did not undermine her credibility in the eyes of the jurors sufficiently to cause them to reject her account of the charged offense.

The jury heard the pretext call during trial. During deliberations, the jury requested a transcript of the call. The jurors would have heard that, on that call, there was no point where the victim accused defendant of *forcible* digital penetration of her vagina and he could have denied it but did not. CALCRIM No. 357 instructed the jury, in part, that "[i]f you decide that any of these requirements" in CALCRIM No. 357 "has not been met, you must not consider either the statement or the defendant's response for any purpose." (CALCRIM No. 357.) Moreover, the jury was separately instructed: "Some of these instructions may not apply depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." (CALCRIM No. 200; see *People v. Chism, supra*, 58 Cal.4th at p. 1299.) "The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.) Inasmuch as

---

[3] Our perception of the last quoted remarks from the recording of the pretext call differs slightly from the written transcript, which states: "I was thinking more about you're lust, you're sexual, getting horny."

13

CALCRIM No. 357 was inapplicable or its elements not satisfied, we presume the jury properly concluded as much.

Based on all of the foregoing, we conclude it is not reasonably probable defendant would have achieved a more favorable result had the trial court not instructed the jury with CALCRIM No. 357. (See *Watson, supra*, 46 Cal.2d at p. 836.) Moreover, even were we to assess prejudice under the *Chapman* harmless beyond a reasonable doubt standard, we would determine there is not "a ' " 'reasonable possibility' " ' that the error contributed to the verdict." (*People v. Reese, supra*, 2 Cal.5th at p. 671; see *Chapman, supra*, 386 U.S. at p. 24.) In light of our determination, we need not address defendant's ineffective assistance of counsel claim, as he could not establish prejudice. (See *Strickland v. Washington* (1984) 466 U.S. 668, 697 [no need to address both deficient performance and prejudice prongs of an ineffective assistance of counsel claim if an insufficient showing is made as to one of them]; *People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407, fn. 4 [*Watson* standard for assessing prejudice is substantially the same as the prejudice prong of *Strickland*].)

## II

### *Fines, Fees, and Penalty Assessments*

### A. Additional Background and Defendant's Contentions

At sentencing, relevant to financial obligations, defense counsel stated: "Initially we would request that the fines and fees be waived or minimized to the greatest extent possible. [¶] Specifically those fines and fees listed on page 9 [of the probation report]. [¶] Request that the restitution fine be minimized to the statutory minimum of $300. That is listed on page 8, number two at [$2,400]. I am requesting [$]300." The fines and fees on page 9 of the probation report to which defense counsel alluded included the $300 sexual habitual offender fine plus the related penalty assessment (§ 290.3), the $453.62 main jail booking fee (Gov. Code, former § 29550.2), and the $90.65 main jail classification fee (*ibid.*).

14

Relying on, among other things, *People v. Dueñas, supra*, 30 Cal.App.5th 1157, defendant asserts the trial court abused its discretion in imposing a $1,000 restitution fine, an amount above the statutory minimum (§ 1202.4, subd. (b)(1)), as well as other fines and fees.  Defendant's contentions appear to be that the trial court erred in imposing the fines and fees without making a finding that he had the ability to pay and in imposing them over his trial counsel's objection.

### B.  Ability to Pay and Forfeiture

"[I]t is of course a familiar rule that appellate courts will not review errors to which an objection could have been, but was not, made in the trial court."  (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1309.)  Defendant's claim that the trial court improperly failed to consider his ability to pay fines and fees is forfeited because he did not assert it in the trial court.  (See *People v. Scott* (1994) 9 Cal.4th 331, 351-354 [to preserve a sentencing issue for appellate review, it must be raised in the trial court]; see also *People v. Nelson* (2011) 51 Cal.4th 198, 227 [defendant forfeited claim that trial court erred in failing to consider ability to pay restitution fine by failing to object at sentencing]; *People v. Acosta* (2018) 28 Cal.App.5th 701, 705 [by failing to object to § 290.3 sex offender fines at sentencing or to assert he lacked the ability to pay them, the defendant waived claim that trial court improperly imposed them].)  A defendant has the burden both to raise inability to pay fines and fees, and to "present evidence of . . . inability to pay the amounts contemplated by the trial court."  (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490.)  Defendant did neither.  Defendant's request that fines and fees "be waived or minimized to the greatest extent possible" does not amount to an objection that the trial court should not impose fines and fees because defendant lacked the ability to pay them or that the court must undertake an ability-to-pay determination.

Insofar as defendant's contentions are premised on *People v. Dueñas, supra*, 30 Cal.App.5th 1157, and the constitutional principles discussed in that case, defendant's contentions are likewise forfeited.  Defendant's sentencing took place on May 21, 2021,

15

more than two years after the decision in *Dueñas* was filed on January 8, 2019. Because defendant did not raise *Dueñas*, due process, or the other constitutional grounds discussed in that case in the trial court, he has forfeited such contentions.

### C. Restitution Fine and Suspended Parole Revocation Restitution Fine

The only contentions defendant has not forfeited relevant to fines and fees would be that the trial court did not "waive[ ] or minimize[ ]" fines and fees "to the greatest extent possible," and that the trial court abused its discretion in imposing a restitution fine in the amount of $1,000 rather than the $300 statutory minimum. Taking the latter contention first, the restitution fine is mandatory unless the court finds "compelling and extraordinary" reasons for not imposing it. (§ 1202.4, subds. (b), (c).) "The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense. If the person is convicted of a felony, the fine shall not be less than three hundred dollars ($300) and not more than ten thousand dollars ($10,000)." (§ 1202.4, subd. (b)(1).) "In setting the amount of the fine pursuant to subdivision (b) in excess of the minimum fine pursuant to paragraph (1) of subdivision (b), the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime. Those losses may include pecuniary losses to the victim or the victim's dependents as well as intangible losses, such as psychological harm caused by the crime. Consideration of a defendant's inability to pay may include the defendant's future earning capacity. A defendant shall bear the burden of demonstrating the defendant's inability to pay. Express findings by the court as to the factors bearing on the amount of

16

the fine shall not be required.  A separate hearing for the fine shall not be required."
(§ 1202.4, subd. (d).)[4]

On this record, we cannot say the trial court abused its discretion in imposing a fine above the minimum amount.  As stated, section 1202.4 requires the trial court to consider, among other things, "the defendant's inability to pay" when setting a restitution fine "in excess of the minimum fine."  (§ 1202.4, subd. (d).)  "Absent evidence to the contrary, we presume that the trial court knew the law and followed it."  (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042.)  Additionally, the record suggests the court did consider defendant's ability to pay.  It expressly stated:  "I am going to impose a significantly lower, but not absolute minimum restitution fine, rather than the recommended [$]2400, which probation, had they been recommending a midterm would have recommended [$]1800.  I am going to impose $1,000 restitution fine."  Beyond the restitution fine and victim restitution, the trial court otherwise chose to "impos[e] only minimum mandatory fees and fines beyond that."  Further, defense counsel had noted earlier at sentencing:  "prior to my client's arrest, he was gainfully employed as a land surveyor for the California High Speed Rail Authority and was financially providing for his children; again, something he will not be able to do if he is in state prison for a period of eight years.  The least amount of time essentially would allow him try to get back into gainful employment and provide for his children."

Defendant "has not identified 'anything in the record indicating the trial court breached its duty to consider his ability to pay.' "  (*People v. Ramirez, supra*, 10 Cal.5th at p. 1043, quoting *People v. Gamache* (2010) 48 Cal.4th 347, 409.)  " '[A]s the trial

---

[4]     Section 1202.4 has been amended since defendant's sentencing.  (Stats. 2021, ch. 257, § 20.)  We quote the current version.  The changes do not affect any issue on this appeal.

17

court was not obligated to make express findings concerning his ability to pay, the absence of any findings does not demonstrate it failed to consider this factor.  Thus, we cannot say on this record that the trial court abused its discretion.' " (*Ramirez*, at p. 1043, quoting *Gamache*, at p. 409)  Nor has defendant established any other basis for us to conclude that the trial court abused its discretion in imposing a restitution fine greater than the statutory minimum.

As for the suspended parole revocation restitution fine (§ 1202.45), that fine is mandatory and "shall" be assessed "in the same amount" as the restitution fine "imposed pursuant to subdivision (b) of Section 1202.4." (§ 1202.45, subd. (a).)  While the parties do not raise this issue, although the suspended parole revocation restitution fine appears on the abstract of judgment, the transcript of defendant's sentencing does not reflect that the trial court orally imposed and suspended this fine.  The oral imposition of sentence constitutes the judgment in an action, and the minutes and abstract cannot add anything substantive to the oral pronouncement.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)  When a trial court fails to impose a statutorily mandated fine or fee, the sentence is unauthorized, and the appellate court may correct the error, even if the People failed to bring it to the trial court's attention.  (*People v. Smith* (2001) 24 Cal.4th 849, 852-853; *People v. Scott, supra*, 9 Cal.4th at p. 354.)  We will modify the oral pronouncement of judgment to reflect the imposition and suspension of the parole revocation restitution fine.

### D.  Additional Fines, Fees, and Penalty Assessments

Other than the restitution fine and the restitution order to the victim and the California Victim Compensation Board (§ 1202.4, subd. (f)), the trial court "impos[ed] only minimum mandatory fees and fines beyond that.  That would include the $453.62 main jail booking fee, the $90.65 classification fee."  In part III of the Discussion, we will discuss, and vacate, the $453.62 main jail booking fee (Gov. Code, former § 29550.2), and $90.65 main jail classification fee (*ibid*.).  The remaining fees appearing on the

18

abstract of judgment were the $40 court operations assessment (§ 1465.8), the $30 conviction assessment (Gov. Code, § 70373), and the $300 sexual habitual offender fine plus $130 in related penalty assessments (§ 290.3).

As with the suspended parole revocation restitution fine, the sentencing transcript does not reflect that the court specifically imposed the court operations assessment or the criminal conviction assessment. These fees are mandatory. (§ 1465.8; Gov. Code, § 70373; *People v. Woods* (2010) 191 Cal.App.4th 269, 271-274; *People v. Knightbent* (2010) 186 Cal.App.4th 1105, 1112.) We shall modify the oral pronouncement of judgment to reflect the imposition of these mandatory fees.

Moreover, these fees were not among those set forth on page 9 of the probation report, which, other than the restitution fine, were the fines and fees defense counsel alluded to in his objection at sentencing. Any contention concerning these fines has been forfeited. (See *People v. Scott, supra*, 9 Cal.4th at pp. 351-354.) In any event, as mandatory fees, the trial court lacked the authority to waive them, and as fees in a specified statutory amount, the court lacked the authority to minimize them. Thus, the court was without authority to sustain defendant's objection and "waive[ ]" or further "minimize[ ]" these fees.

Subdivision (a) of section 290.3 provides, in pertinent part: "Every person who is convicted of any offense specified in subdivision (c) of Section 290 shall, in addition to any imprisonment or fine, or both, imposed for commission of the underlying offense, be punished by a fine of three hundred dollars ($300) upon the first conviction . . . , unless the court determines that the defendant does not have the ability to pay the fine." Violation of section 289 is among the offenses specified in subdivision (c) of section 290. The fine imposed pursuant to section 290.3, subdivision (a) is " 'mandatory, "unless the court determines that the defendant does not have the ability to pay the fine." ' " (*People v. Burnett* (2004) 116 Cal.App.4th 257, 261.) However, failure to assert inability to pay in the sentencing court forfeits the contention that the defendant was unable to pay

19

the fine or fee, or that the sentencing court failed to consider the defendant's ability to pay.  (See *People v. McCullough* (2013) 56 Cal.4th 589, 597-598; *People v. Gibson* (1994) 27 Cal.App.4th 1466, 1467-1468.)  Defendant's failure to object to the sexual habitual offender fine on the basis of his inability to pay, or object to the fine beyond requesting the fines and fees on page 9 of the probation report be "waived or minimized to the greatest extent possible," forfeits the claim that the trial court failed to consider his ability to pay it.  Moreover, as with the court operations assessment and criminal conviction assessment, the court was without authority to "waive[ ]" or further "minimize[ ]" this fine as requested by defense counsel.  Because the section 290.3 fine "shall" be imposed absent a determination the defendant lacks the ability to pay, we shall modify the oral pronouncement of judgment to reflect the imposition of this fine and the related penalty assessment.

To the extent defendant makes any argument concerning the trial court's orders of restitution to the victim in the amount of $7,100, and to the California Victim Compensation Board in the amount of $4,762.50 (§ 1202.4, subd. (f)), such contentions are forfeited by defendant's failure to raise them in the trial court, where he did not mention these restitution orders or even allude to them in referencing the probation report.  (See *People v. Scott, supra*, 9 Cal.4th at pp. 351-354.)

### III

#### *Booking Fee and Jail Classification Fee*

Defendant asserts that, following the enactment of Assembly Bill No. 1869 (2019-2020 Reg. Sess.) (Stats. 2020, ch. 92), the main jail booking fee and the main jail classification fee are no longer enforceable, are uncollectable, and must be stricken.  The Attorney General concedes the issue.  We agree.  These fees are no longer valid based on the Legislature's passage of Assembly Bill No. 1869.  Among other things, Assembly Bill No. 1869 repealed Government Code section 29550.2, which authorized these fees.  (Stats. 2020, ch. 92, § 25.)  It also enacted Government Code section 6111, which

20

provides: "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to Section 27712, subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Gov. Code, § 6111, subd. (a).)  We shall vacate the main jail booking and main jail classification fees.

## DISPOSITION

The oral pronouncement of judgment is modified to reflect the imposition of a $1,000 suspended parole revocation restitution fine pursuant to section 1202.45, a $40 court operations assessment pursuant to section 1465.8, a $30 criminal conviction assessment pursuant to Government Code section 70373, and a $300 sexual habitual offender fine and related penalty assessment pursuant to section 290.3.  The $453.62 main jail booking fee and the $90.65 main jail classification fee are vacated.  As so modified, the judgment is affirmed.  The clerk shall prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.


    /s/
    HOCH, J.


We concur:


 /s/
MAURO, Acting P. J.


 /s/
RENNER, J.

21